Filed 9/8/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, )
) S075136
    v. )
)
DANIEL SANCHEZ COVARRUBIAS, )
) Monterey County
    Defendant and Appellant. ) Super. Ct. No. SC942212C
_____ )

A jury convicted defendant Daniel Sanchez Covarrubias of the first degree murders of Ramon Morales, Martha Morales, and Fernando Martinez (Pen. Code, § 187, subd. (a); counts 1 through 3),[1] attempted murder of 11-month-old Alejandra Morales (§§ 187, 664; count 4), assault with a firearm of Alejandra Morales (§ 245, subd. (a)(2); count five), three counts of robbery (§ 212.5, subd. (a); counts 6 through 8), residential burglary (§ 459; count 9), and conspiracy to commit robbery and burglary (§ 182, subd. (a)(l); count 10). The jury further found true the special circumstance allegation of multiple murder (§ 190.2, subd. (a)(3)) and allegations that the murders were committed while defendant was engaged in the commission or attempted commission of the crimes of robbery and burglary (§ 190.2, subd. (a)(17)(A), (G)).

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

As to counts 1 through 9, the jury found that a principal was armed with a firearm, a .38-caliber handgun and a .30-30 rifle, (former § 12022, subd. (a)(1)) and an assault weapon, an AR-15 semiautomatic assault rifle, (former § 12022, subd. (a)(2)).  The jury found not true the allegation that defendant was personally armed with a knife (former § 12022, subd. (b)) and was unable to reach a verdict on the allegation that defendant personally used a handgun (former § 12022.5, subd. (a)).

Following the penalty phase of the trial, the jury returned a verdict of death. The trial court denied defendant's motion for modification of the penalty to life imprisonment without the possibility of parole (§ 190.4, subd. (e)) and sentenced him to death on the murder counts.  On the remaining counts, the court imposed an aggregate determinate sentence of 32 years four months, stayed pending execution of the death sentence.

This appeal is automatic.  (§ 1239, subd. (b).)  We reverse the judgment of death because of the erroneous excusal of a prospective juror during jury selection, remand the matter for a new penalty determination and reconsideration of the question of a restitution fine under the currently applicable statute, and affirm the judgment in all other aspects.

## I. FACTS

### A.  Guilt Phase

#### 1.  Prosecution Evidence

##### a.  Overview

On November 16, 1994, Ramon Morales (Ramon), his wife Martha Morales (Martha), and her brother Fernando Martinez (Martinez), were shot and killed during a home invasion robbery committed by defendant and his cousins Antonio Sanchez (Sanchez) and Joaquin Nunez (Nunez), and his 16-year-old

nephew, Jose Luis Ramirez (Ramirez).[2]  The Moraleses' 11-month-old daughter, Alejandra Morales (Alejandra), was shot multiple times and survived.[3]

After the homicides, defendant fled to Mexico.  In July 1995, he was captured at his home in Mexicali, Mexico, returned to the United States by bounty hunters, and eventually taken into custody in Monterey County to face charges in this case.  Sanchez and Nunez were subsequently taken into custody in Mexicali.

Ramirez testified pursuant to a plea agreement with the Monterey County District Attorney's Office that provided he would plead guilty to three counts of robbery and one count of burglary and serve a sentence of 11 years eight months in exchange for his truthful testimony.

### b. Background

In early 1994, Ramon, Martha, Alejandra, and Martinez rented a house on Toro Street in Salinas with four other individuals.  In August 1994, Sanchez moved into the house.

Ramirez frequently visited the house.  According to Ramirez, Sanchez and Ramon were "good friends"; they stole cars and sold drugs.  Sanchez "sold a lot of cocaine" for Ramon.  At some point, Ramon and Sanchez had a dispute over drug

---

[2]    We will sometimes refer to defendant, Sanchez, Ramirez, and Nunez as the four men.

[3]    Another of defendant's cousins, Lorenzo Nunez (Lorenzo), was also prosecuted for his involvement in the crimes.  For approximately three months before the crimes, he lived in the house with the victims.  Two days before the crimes, Lorenzo gave Sanchez and Nunez two rifles that he had stolen from Ramon.  Lorenzo was separately tried and convicted as an aider and abettor of three counts of murder and related charges, and sentenced to a prison term of 40 years to life.  The Court of Appeal affirmed the convictions in an unpublished decision, and this court denied review.

money.  Each said they wanted to kill the other.   Ramon and Sanchez also quarreled over money that Ramon owed to Sanchez for repairing Ramon's car.

Around September 1994, Sanchez went to Mexicali, Mexico.  Meanwhile, the Morales family, Martinez, and Lorenzo moved into a converted garage apartment on East Market Street in Salinas.  The apartment consisted of a living room and kitchen, each of which was 10 feet by 10 feet, and a bedroom/bathroom combination room.

In November 1994, defendant was living in Southern California.  Around November 11, defendant arrived in his car at the home of his sister, Bertha Sanchez (Bertha) in Salinas.  Sanchez and Nunez accompanied defendant.  They all stayed at Bertha's house overnight.  Defendant told her he intended to return to Southern California the following day.  Bertha asked him to wait because she was going to drive to Mexicali in a couple of days to pick up her husband, and she wanted him to follow her in his car in case she had mechanical problems.  Defendant agreed, and they planned to leave on Thursday, November 17.  Defendant, Sanchez, and Nunez stayed at Bertha's house until November 16, the day of the homicides.

On November 15, Lorenzo visited defendant, Sanchez, and Nunez at Bertha's house.  Lorenzo pulled some guns out from under a sofa.   When Bertha saw the guns, she told defendant to remove them from the house.  He took them to his car, and the four men left.  Bertha testified the guns could have been an AR-15 and a .30-30 rifle.

   *c.  The day of the homicides*

    *(i)  Morning hours and the drive to the trailer park*

About 10 a.m. on November 16, 1994, Sanchez, defendant, and Nunez arrived at Ramirez's house in defendant's car.  For a couple of hours, they ate,

played dominoes, and drank beer.  In the afternoon, defendant drove himself and Sanchez, Ramirez, and Nunez[4] to a trailer in a nearby trailer park so that Sanchez could collect $100 on a debt owed to him.

### (ii)  JKD Shooting Sports store

After they left the trailer park, defendant drove to JKD Shooting Sports in Salinas.  Defendant stayed in the car and the others went inside.  With the $100 he had collected at the trailer park, Sanchez purchased .223-caliber ammunition and a high-capacity magazine that could fit an AR-15 semiautomatic assault rifle.  The magazine could hold 40 rounds, and the box of ammunition contained 50 rounds.  Sanchez also purchased ammunition for the .30-30 rifle.[5]

### (iii)  Visits to the homes of Amy Arredondo, Amy Trejo, and Bertha Sanchez

After the four men left the firearms store, defendant drove them to the home of Amy Arredondo, Sanchez's half sister, where they had dinner and drank more beer.  Arredondo saw Sanchez and Nunez each had a big rifle; they said one was an "R-15" (*sic*) and the other was an "M-16."  Arredondo informed the four men that they had to leave because she did not want guns in her house.  They departed around 5:30 p.m. and drove to the home of her daughter, Amy Trejo.

Upon arriving at Trejo's house, Sanchez went to a car he stored there, telling Ramirez he was going to get his rifles out of the car.  Trejo saw Sanchez take a box from his trunk and place it in defendant's car trunk.  She had seen

---

[4]     Unless otherwise indicated, defendant drove himself, Sanchez, Ramirez, and Nunez in his car to various locations on the day of the homicides, including the Morales house.

[5]     The register receipt indicated that the ammunition was purchased on November 15, 1994.  A clerk at the store, James Fletcher, testified that the date on the receipt was correct and that the purchase occurred "very early on during the day."

"guns" in the box on a previous occasion. Trejo knew that there had been problems between Sanchez and Ramon and that Sanchez "wanted to get" Ramon, and Ramon "wanted to get" Sanchez. The four men were at Trejo's house for about 15 minutes and then left.

After leaving Trejo's house, the four men went to Bertha's house and fixed a tire on her car. Afterward, they sat in defendant's car, drinking beer with Bertha's son, Jorge Acosta. Sometime between 7:00 and 8:00 p.m., Bertha came home. She became upset when she found the men drinking in the car. Bertha believed defendant was drunk and testified that she would not have driven in a car with him that evening. Jorge got out of the car and went inside with his mother. The four men left in defendant's car.

#### (iv) Test-firing the rifles

After leaving Bertha's house, defendant drove them into the foothills outside Salinas. On the way, Sanchez, who was in the front seat, talked about going to Ramon's house to rob and kill him. Sanchez and Ramirez put ammunition in the high-capacity magazine Sanchez purchased at the firearms store. When defendant stopped the car, all four men exited. After defendant opened the trunk, Sanchez grabbed an AR-15 rifle, and Nunez grabbed a .30-30 rifle. The trunk contained a bag of ammunition different from that purchased at the firearms store. Everyone got back into the car, and defendant slowly drove around as Sanchez and Nunez test-fired their rifles by shooting them into the air from the rolled-down window. Ramirez test-fired the .30-30 rifle once.

Robert Falcon, who lived three miles outside of Salinas in the foothills, heard three or four gunshots nearby and called 911. Monterey County Sheriff's Deputy Greg Liskey arrived about 40 minutes later, at 8:41 p.m. but found nothing suspicious.

6

### (v) Guillermo Morales's home and the motel

After test-firing the rifles, defendant, Sanchez, Ramirez, and Nunez decided to go to the home of Guillermo Morales, Ramon's brother. Sanchez said that "they also want[ed] to kill Guillermo." On the way to Guillermo's, defendant said he wanted a smaller weapon and detoured to the house of one of Ramirez's friends who was known to have guns. When they learned that the friend was not home, the four men headed to Guillermo's house. Upon arriving there, they discovered no one was home. The four men then headed toward a hotel where they understood that a person named "Frank" was staying. Sanchez said that he wanted to kill Frank because he owed Sanchez $100 or $200. When they arrived at the hotel, no one got out of the car. They left and defendant drove to the Morales house.

### (vi) The shootings

When the four men arrived at the Morales residence, defendant parked around the corner. There, defendant and Sanchez came up with a plan to go in the house, steal "stuff," and kill whoever was inside so that there would be no witnesses to their crimes. Defendant volunteered to knock on the front door because no one in the house knew him.

The four men exited defendant's car. Nunez had the .30-30 rifle, Sanchez had the AR-15, and defendant had a seven- or eight-inch knife.[6] Defendant went to the door, knocked, and when no one answered, he opened the door and went inside. Defendant grabbed Martinez, who was sleeping in the living room, held him at knifepoint, and told him not to look at anyone. Sanchez, Nunez, and

---

[6]     As stated above, the jury found not true the allegation that defendant was personally armed with a knife.

7

Ramirez followed defendant inside the house.  Sanchez pointed his rifle at Martinez.

Defendant and Sanchez stayed in the living room with Martinez; Ramirez and Nunez started to search the bedroom for items to steal.  Sanchez instructed Ramirez to take whatever he could from the house.  Ramirez transported various items, including a video cassette recorder (VCR) and stereo equipment, to defendant's car.  Ramirez also took a neck chain, a .32-caliber handgun that Sanchez handed him, and a hair oil product.  Ramirez made three trips to the car.  Defendant searched boxes that were near a wall.

About 9:00 p.m., on his last trip taking items to defendant's car, Ramirez saw Ramon drive up.  Ramirez went inside and told Sanchez that Ramon and Martha were coming.  Nunez hid behind the front door.  Defendant took Martinez into the bedroom.  Sanchez and Ramirez hid in the kitchen behind the refrigerator.  When Martha entered the house, Nunez pointed his rifle at her and forced her into the bedroom.  Martha was carrying Alejandra.  When Ramon entered, Sanchez pointed his AR-15 rifle at him, ordered him to kneel down, and demanded Ramon tell him where the drugs, money, and guns were.  At some point, defendant tried to place a blindfold on Ramon.  Ramon told Sanchez that he had $5,000 in the bank and that his brother had the drugs.  Sanchez kept his rifle pointed at Ramon while defendant searched for guns.  Defendant then found two handguns in a box near the kitchen.  Ramirez testified that he thought one of the guns was a .38-caliber handgun, and the other he could not remember.  He thought defendant used his left hand to put the gun Ramirez believed to be a .38-caliber handgun in Sanchez's jacket pocket.  Defendant held the other gun in his right hand.

As Ramon was begging for his life in the living room, Ramirez heard what sounded like a .30-30 gunshot from the bedroom.  Ramirez fled.  "Fairly rapid" gunfire erupted inside the house.  Della Longoria, a neighbor, heard the gunfire

8

and saw gun smoke come through the opened front door of the Morales house. Longoria identified the first person she saw run from the house to be defendant and believed he was carrying a rifle.

Meanwhile, Ramirez ran to the next block. When he looked back at the Morales house, he saw defendant, Sanchez, and Nunez, running to defendant's car. Defendant sped away with the car's headlights off.

### (vii) Events immediately following the homicides

Around 9:00 p.m., police responded to the scene and discovered Ramon's body on the living room floor. Martinez's body was found near the doorway leading to the bedroom and bathroom, and Martha's body was found in the bedroom at the foot of the bed. Alejandra was lying near Martha's knees, crying and covered in blood.

Ramirez ran to his cousin Amy Trejo's house. He was dressed in dark clothing, wore a knit cap, and had in his possession the neck chain, the .32-caliber handgun, and the hair oil product that he took from the Morales's house. Ramirez gave these items to Arturo Perez and left.

Later that night, defendant went to the home of his sister Elvia Covarrubias and asked for gas money. He left immediately after he was given $50. Defendant fled to Mexico.

The next day, Ramirez returned to Trejo's house with a friend, Daniel Barba. Ramirez gave the handgun, which was inoperable, to Daniel. Perez helped Ramirez sell the neck chain at a pawnshop for $60.

### d. Investigation

Salinas police investigators found the following on the bed in the bedroom: a box of .38-caliber ammunition (full metal jacket rounds); a box of .380-caliber ammunition (full metal jacket rounds); a box of baby diapers; and a cashbox. At

9

least four cartridges were missing from the box of .38-caliber ammunition, and five were missing from the box of .380-caliber ammunition. Defendant's fingerprints were on both boxes of ammunition and the box of diapers. Ramirez's fingerprints were on the cashbox.

Investigators found the following additional items during their search of the crime scene: two boxes in the living room, one containing a .22-caliber intact bullet and a spent casing and the other containing a .380 semiautomatic pistol; a trash can in the kitchen containing a vinyl bag full of .22-caliber ammunition; a box of .32-caliber ammunition on top of the refrigerator; a box of .22-caliber ammunition, a Taser gun, and a small amount of hashish on the bedroom floor; and a triple-beam scale in the chicken coop outside the house. During a separate search of the residence conducted more than a month after the homicides, police found two .380-caliber pistols in the bedroom and a .22-caliber rifle in the chicken coop.

Alejandra was treated at a local hospital emergency room. She suffered a .38-caliber through-and-through gunshot wound; the bullet had entered her left shoulder area and exited through her back. The infant also suffered four nonfatal gunshot wounds to her leg that were caused by a single bullet.

Personnel processing the victims' bodies at the coroner's office collected $204.37 from Ramon's pocket, $123 from Martinez's pocket, and $51 from Martha's purse.

### e. Autopsies

Dr. John Hain performed the autopsy on each victim. Martinez was fatally shot in the back of the head, execution style and at point-blank range. Martinez also suffered a .38-caliber gunshot wound to his back, which probably occurred postmortem.

10

Ramon died from multiple gunshot wounds. He suffered "massive" wounds to the face "in that there was a 4-by-5 inch area of the face that was just torn apart." Three entrance wounds to Ramon's lower chest "virtually tore the heart to pieces." Seven .223-caliber bullets were recovered from Ramon's body. A single .38-caliber bullet was recovered from the back of his head.

Martha suffered two fatal "devastating" gunshots to her forehead that left "her face … torn away by the blast of the gunshots and in front of the skull." The bullets that caused the head wounds, a .38-caliber bullet and a .30-caliber hollow-point bullet, traveled to and became lodged in Martha's right shoulder and armpit, respectively, and were recovered from those areas. A .223-caliber bullet was recovered from her left side. Martha probably died within minutes of being shot.

### f. Ballistics Evidence

Criminalist Larry Waller collected 18 .223-caliber shell casings from the crime scene. Four casings were located outside the front door of the residence, but most of the remaining casings were discovered in the living room and kitchen area. Waller also found four .30-30 casings — one in the living room, one at the junction of the living room and the kitchen, and two next to Martinez's body. Investigators collected a .30-caliber bullet that dislodged from between Martinez's eyes when his body was rolled over.

Senior Criminalist Scott Armstrong analyzed 16 of the .223-caliber casings and concluded that all but one were fired from the same weapon, most likely a semiautomatic rifle like an AR-15. He could not determine whether the remaining casing was fired from the same weapon. Armstrong examined the four .30-30 casings and concluded that all four were fired from the same rifle. Armstrong also examined a .30-caliber bullet recovered from Martinez's body and one recovered

11

from Martha's body and determined that both were consistent with having been fired from a Martin Lever Action .30-30 rifle.

Five expended .38-caliber bullets were recovered; two from under the bed and one from each of the three homicide victims. Armstrong concluded that the three bullets found in the homicide victims and one of the bullets found under the bed were fired from the same weapon. He could not determine whether the second bullet found under the bed was fired from that weapon. The bullets found in the homicide victims were "full metal jacket round nose type." Armstrong compared tool marks on a bullet from one of the cartridges in the .38-caliber ammunition box found in the bedroom with marks on the .38-caliber bullets recovered from the homicide victims. Based on his comparisons, the expert concluded all four bullets "were manufactured on the same tool, at the same factory, at about the same time."

Criminalist Julie Doerr examined the jacket and "onesie" sleeper that Alejandra was wearing when she was shot, as well as one of the .38-caliber expended bullets found under the bed. Holes in the upper left shoulder and mid-back area of the sleeper corresponded with holes in the jacket. The nose of the bullet contained a tuft of green fibers that were consistent with the fibers on Alejandra's jacket. Doerr opined that it was "highly likely" the bullet passed through the jacket.

g. *Defendant's videotaped statement*

As noted earlier, after the homicides, defendant fled to Mexico. Meanwhile, Lorenzo Nunez was arrested and prosecuted separately for his involvement in the homicides. Crecencio Padilla, an investigator with the Office of the Monterey County Public Defender who represented Lorenzo Nunez in his state criminal proceedings, contacted Lorenzo's sister, Yolanda Nunez, and asked

her to contact defendant and ask for his assistance in defending Lorenzo. Subsequently, on July 20, 1995, defendant's sister, Bertha, provided a videotape to investigator Padilla.

On the videotape, defendant stated that he was making a statement "in the hopes it will be of some use to Lorenzo Nunez Martinez because on the 16th day of November of 1994 we committed a — a crime but one in which Lorenzo Nunez did not — did not participate at all . . . ." Defendant proceeded to admit the following: He was at the Morales house with Sanchez, Joaquin Nunez, and Ramirez when the victims were shot, but went there only to help Sanchez "pick up some things that were left in the house." Defendant had weapons in his car that Lorenzo gave him the day before the homicides. Defendant intended to sell the weapons in Mexico and, with the proceeds, bring Lorenzo's wife and daughter to Salinas. The weapons were brought into the house because Sanchez told them Ramon had threatened to kill him. Once inside, Sanchez asked Martinez "about some things that — that he had left there," but Martinez "said that he didn't know about that." Sanchez "started to — to with his eyes, to look around and . . . didn't find them." When Ramon was lying on the floor, he pulled out a weapon, and "out of fear, we all shot. We fired the weapons that we had . . . we shot really like crazy."

Defendant was subsequently brought back to the United States by bounty hunters. On September 29, 1995, defendant was arraigned in Monterey County Superior Court.

### 2. *Defense Evidence*

Defendant did not testify. His attorney conceded that on the night of the homicides, defendant went to the Morales residence with Sanchez, Ramirez, and Nunez and that Sanchez and Nunez brought weapons. Defendant's defense was

13

that he went to the Morales house simply to obtain property belonging to Sanchez, that Ramirez was untruthful, and that absent Ramirez's testimony, there was no evidence defendant was aware of any plan to burglarize, rob, or murder the Morales family.

Trial counsel elicited from Ramirez on cross-examination that he lied to police when he told them (1) that defendant gave him one of the handguns he found near the kitchen and (2) that he (Ramirez) was looking through the window when he saw defendant with a handgun in his hand. Ramirez testified that he was in the entryway when he saw defendant with a handgun, and that he never saw defendant load a weapon. Ramirez also testified that on the day of the homicides, the four men bought four 12-packs of beer, and each drank about six beers.

Jorge Acosta, Bertha's son, testified that on the evening of the homicides, he saw defendant, who was his uncle, and the other men drinking in defendant's car parked outside his mother's house. Acosta was worried about how much defendant was drinking and "concerned . . . his uncle . . . [would] be getting into some trouble or crashing or getting stopped."

Acosta also testified that a few days before the homicides, the four men came to visit. Acosta saw an "assault weapon" and a "rifle" but did not see defendant handle either weapon.

Salinas Police Detective Joseph Gunter interviewed Ramirez on November 18, 1994. District Attorney investigator Richard Moore interviewed Ramirez on October 31, 1995. Ramirez never mentioned to either Gunter or Moore that on the day of the homicides, the four men went to a friend's house to get defendant a weapon. Nor did Ramirez mention that they went to Guillermo Morales's house to kill him.

14

**B. Penalty Phase**

*1. Prosecution Evidence*

*a. Circumstances of the crimes*

The prosecution presented testimony of an expert in crime scene reconstruction who examined the crime scene photographs, police and autopsy reports, and evidence collected at the scene. The expert testified concerning the position of each victim's body when shot, the nature of each victim's gunshot wounds, and the location of the shooters when the victims were shot.

*b. Victim impact evidence*

The prosecution presented victim impact testimony from Martha's and Martinez's mother and father, Josephina Vasquez and Juan Martinez Gonzalez; their sister, Patricia Martinez Becerra; and Ramon's mother, Magdalena Diaz. Each testified concerning their loss, how the homicides had affected their lives, and the additional emotional pain caused by having closed caskets at the funerals because of the extensive injuries each victim suffered.

Alejandra was almost five years old at the time of trial. She had been diagnosed with a genetic disease that requires her to live in a special medical care foster home. Her disease is unrelated to the gunshot wounds she suffered. Martha's parents, who lived in Mexico, had been unsuccessful in their efforts to obtain custody of Alejandra.

*c. Evidence submitted in aggravation under section 190.3, factor (b)*

The prosecution presented evidence of multiple other acts of violence or threats of violence by defendant while in custody at the Monterey County jail prior to trial. (§ 190.3, factor (b).) On June 30, 1996, sheriff deputies found a dismantled razor blade, two pieces of wire, three buttons, and a string hidden in defendant's jail-issued deodorant stick. Deputies also found a second dismantled

15

razor blade and a "cut open" toothbrush lodged under defendant's bed frame.  On July 13, 1996, deputies found a dismantled razor in a brown paper bag in defendant's cell.  The items found could be used as weapons or to fashion a weapon from some of the other items.

On August 18, 1996, defendant repeatedly punched a sheriff deputy in the back of his head and neck in an attempt to escape from the jail facility.  When deputies subsequently apprehended defendant, he was in possession of a blue watch cap and a pencil, and had a piece of paper in his pocket, which contained writing in Spanish or code.

### 2. *Defense Evidence*

Defendant's brother-in-law, Robert Reynoso, his brother, Luis Covarrubias, his sisters, Bertha Sanchez and Elvia Covarrubias, and his friend, Moises Diaz, all testified that defendant was a good brother and caring and generous person and friend.  Defendant was respectful to people and hard working.  In 1989, defendant volunteered his time and truck to transport food and clothing to survivors of the Loma Prieta earthquake.  Defendant helped Reynoso for a year when he was regularly on a dialysis machine.

Defendant was married and had four children ranging in ages from 6 to 11 years old.  He was very loving toward his family and friendly with all his neighbors.  Defendant's relatives and friends intended to continue to support and visit defendant in prison if he were sentenced to life without possibility of parole.

Defendant presented the sworn statements of four individuals who were his neighbors in Mexico (Juan Manuel Avila Sanchez, Jose Guadalupe Espinoza Flores, Martina Dominguez de Castro, and Maria Guadalupe Castro de Gonzalez).  The statements provided positive character testimony that showed defendant to be

a caring, generous person who was concerned about his family and was friendly, helpful, and respectful to other people.

Dr. Thomas Reidy, a forensic psychologist, was asked to evaluate defendant with regard to his "life history and adverse factors and positive life factors that . . . shaped his life," but specifically excluding information about the crimes and homicides. Defendant grew up in poverty in Mexico. His father was intolerant and abandoned the family when defendant was a small child. Defendant was raised by his mother, who was absent for periods of up to six months at a time when she was working in the United States or in the fields. When defendant's mother was absent, his sister and brother cared for him. When defendant was seven or eight years old, his older brother, who was very close to him, was stabbed to death.

Defendant began to work at age 10 washing cars. He started abusing alcohol around age 14. Defendant performed well in school and went on to secondary education. His mother committed suicide in his early adulthood. He suffered two convictions for driving under the influence and one for driving on a suspended license. For a couple of years, he would give rides to family members and friends from Mexico to the United States, but he did not profit financially from this work. Dr. Reidy explained that defendant "expressed a great remorse regarding what happened in this case," and that when defendant talked about this case, he kept his head down, "looked very sad," and "talked about being sad." Dr. Reidy concluded that defendant did not have an antisocial personality disorder and was not a psychopath.

17

## II. DISCUSSION

### A. Jury Selection Issues

#### 1. *Excusals for Cause Based Solely on Written Questionnaires*

Defendant contends the trial court erroneously excused for cause five prospective jurors (Prospective Jurors Nos. 11, 12, 16, 39, and 50) based solely on their written questionnaire answers concerning their personal views on capital punishment, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[7]  (See *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*); *People v. Riccardi* (2012) 54 Cal.4th 758, 778-783 (*Riccardi*).)  We conclude the trial court erred in excusing Prospective Juror 16 for cause based solely on his questionnaire responses.  Although this error did not result in the seating of an unqualified juror, it requires automatic reversal of defendant's death sentence under existing United States Supreme Court precedent. (*Gray v. Mississippi* (1987) 481 U.S. 648, 659-667 (*Gray*) (opn. of the court); *id*.,

---

[7]     Here, and in nearly every other claim raised in this appeal, defendant contends the asserted error violated various of his state and federal constitutional rights.  "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances.  In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional legal consequence of violating the Constitution.  To that extent, defendant's new constitutional arguments are not forfeited on appeal.  [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17, italics omitted.)  " ' "No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." ' " (*People v. Clark* (2011) 52 Cal.4th 856, 890, fn. 7.)

18

at pp. 667-668 (plur. opn.).) In light of our conclusion, we need not decide whether the trial court erred in dismissing any of the remaining prospective jurors.

### a. The written questionnaire

The prospective jurors completed a 21-page questionnaire. Questions Nos. 50-58 sought the prospective jurors' general views on the death penalty. Question No. 59 explained the difference between the guilt trial and penalty trial, described the meaning of "special circumstance," and defined aggravating and mitigating circumstances. The question then explained that "[t]he weighing of these factors is not quantitative, but qualitative, [and] in order to fix the penalty of death, the jury must be persuaded that the aggravating factors are so substantial in comparison with the mitigating factors that death is warranted instead of life imprisonment without parole." The question continued in six subparts: "(A) Assume for the sake of this question only that, in the guilt phase, the prosecution has proved first degree murder beyond a reasonable doubt and you believe the defendant is guilty of first degree murder. Would you, because of any views that you may have concerning capital punishment, refuse to find the defendant guilty of first degree murder, even though you personally believed the defendant to be guilt [*sic*] of first degree murder, just to prevent the penalty phase from taking place?

"(B) Assume for the sake of this question only that, in the guilt phase, the prosecution has proven one or more special circumstances to be true beyond a reasonable doubt, and you personally believe the special circumstance(s) to be true. Would you, because of any views that you may have concerning capital punishment, refuse to find the special circumstance(s) true, even though you personally believed it (them) to be true, just to prevent the penalty phase from taking place?

19

"(C) Assume for the sake of this question only that the jury has found the defendant guilty of first degree murder and has found one or more special circumstances to be true and that you are in the penalty phase. Would you, because of any views that you may have concerning capital punishment, automatically refuse to vote in favor of the penalty of death and automatically vote for a penalty of life imprisonment without the possibility of parole, without considering any of the evidence of any of the aggravating and mitigating factors . . . regarding the facts of the crime and the background and character of the defendant?

"(D) Assume for the sake of this question only that the jury has found the defendant guilty of first degree murder and has found one or more of the special circumstances true and that you are in the penalty phase. Would you, because of any views that you may have concerning capital punishment, automatically refuse to vote in favor of the penalty of life imprisonment without the possibility of parole and automatically vote for a penalty of death, without considering any of the evidence, or any of the aggravating and mitigating factors . . . regarding the facts of the crime and the background and character of the defendant?

"(E) If your answer to either question C) or question D) was yes, would you change your answer if you are instructed and ordered by the court that you must consider and weigh the evidence and the above-mentioned aggravating and mitigating factors regarding the facts of the crime and the background and character of the defendant, before voting on the issue of penalty?

"(F) Could you set aside your own personal feelings regarding what the law ought to be and follow the law as the court explains it to you?"

Question No. 61[8] explained that there would be a "wide spectrum of possible evidence" that the jury would be asked to consider in any penalty phase and that in any such phase of trial, the jurors would determine the weight of the evidence presented. The question continued: "Considering the above, assume a defendant was convicted of multiple premeditated murder during the course of a robbery and burglary as special circumstances[.] [W]hich of the following would you do? [¶] ___ (a) No matter what the evidence was, always vote for the death penalty. [¶] ___ (b) Always vote for life without the possibility of parole. [¶] ___ (c) I would not automatically vote for either life without possibility of parole or the death penalty. I would consider all the evidence and vote my conscience."

Question No. 62 inquired as follows: "If this case has a penalty phase, you will be instructed that you may consider factors in the defendant's background, such as his upbringing, emotional difficulties and possible substance abuse in deciding whether to impose the death penalty or life in prison without the possibility of parole. [¶] A. Do you feel that those factors would be helpful to you in reaching a decision as to whether the death penalty or life in prison without the possibility of parole is the appropriate sentence? [¶] B. Would you reject any of those factors automatically in deciding on a sentence?"

Question No. 63 asked the prospective juror if she or he would feel precluded from imposing the death penalty upon learning the defendant had children.

---

**8** Question 60, which is not relevant to our discussion, asked whether the prospective juror would have difficulty refraining from discussing the case with anyone until it is submitted to the jury and then discuss the case only with fellow jurors.

After the prospective jurors completed their written questionnaires, the court and counsel discussed the qualifications of prospective jurors whom the court had preliminarily identified as potentially excusable based solely on their written questionnaire responses. During this process, the trial court excused Prospective Jurors Nos. 11, 12, 16, 39, and 50 for cause under *Witt*.

### b. Legal principles

"Under decisions of the United States Supreme Court, prospective jurors who express personal opposition to the death penalty are not automatically subject to excusal for cause as long as 'they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' (*Lockhart v. McCree* (1986) 476 U.S. 162, 176; see *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522 (*Witherspoon*).) To determine if a prospective juror is excusable for cause without compromising a defendant's constitutional rights, we inquire whether the prospective juror's views on the death penalty 'would "prevent or substantially impair the performance" ' of the juror's duties in accordance with the court's instructions and his or her oath." (*Riccardi*, *supra*, 54 Cal.4th at p. 778.) " 'It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' [Citation.]" (*People v. Leon* (2015) 61 Cal.4th 569, 591-592 (*Leon*); see *People v. Stewart* (2004) 33 Cal.4th 425, 445 et seq. (*Stewart*).)

"Before granting a challenge for cause, the 'court must have *sufficient information* regarding the prospective juror's state of mind to permit a reliable determination as to whether the juror's views would " 'prevent or substantially

impair' " ' performance as a capital juror. [Citation.] Trial courts must therefore make 'a conscientious attempt to determine a prospective juror's views regarding capital punishment to ensure that any juror excused from jury service meets the constitutional standard . . . .' " (*Leon*, *supra*, 61 Cal.4th at p. 592.) "Prospective jurors may be dismissed based on written questionnaire responses alone if the responses leave no doubt that their views on capital punishment would prevent or substantially impair the performance of their duties in accordance with the court's instructions and the jurors' oath. [Citation.] By contrast, if a juror's questionnaire responses are inconsistent and do not clearly reveal an inability to serve, the court may not grant a cause challenge without further questioning to clarify the juror's views." (*Ibid*.) On appeal, we independently review a trial court's for cause dismissals that were based solely on written questionnaire responses. (*Riccardi*, *supra,* 54 Cal.4th at p. 779.)[9]

### c. Discussion

Defendant contends Prospective Juror No. 16 was improperly excused for cause under *Witt* based solely on his written questionnaire responses, because he did not unequivocally state that he would always vote *against* the death penalty in every case regardless of the evidenced presented. Based on our independent review of the record, we agree that the trial court erred by excusing the

---

[9] We note that defendant objected to the excusals of only Prospective Jurors Nos. 12, 16, and 50. At the time of defendant's trial, however, the defense was not required to object to an excusal for cause in order to preserve a claim of error for appeal. Since then, we have imposed prospectively the requirement that defendants "must make either a timely objection, or the functional equivalent of an objection, such as a statement of opposition or disagreement, to the excusal stating specific grounds under *Witherspoon*/*Witt* in order to preserve the issue for appeal." (*People v. McKinnon* (2011) 52 Cal.4th 610, 643.)

prospective juror for cause under *Witt* based solely on his written questionnaire responses.

Prospective Juror No. 16 was a correctional officer with the California Department of Corrections and Rehabilitation. In response to question No. 50, a multipart question that asked the prospective juror about his death penalty views in general, Prospective Juror No. 16 indicated that he "strongly" opposed the death penalty and wrote, "I believe that the death penalty should be abolished as there is no assurance that the state may not be killing an innocent person." When asked in another part of the same question to explain his position on capital punishment, he wrote, "In addition to the above I feel the state does not have the right to take a life in revenge for the crime the person commits. I also feel it is not a deterrent to crime." In response to question No. 58, which asked the prospective juror about the frequency with which capital punishment is used, Prospective Juror No. 16 wrote that he believed the death penalty was imposed "too often" and "opposed it completely."

As set forth above, question No. 59 parts (C), (D), (E), and (F) were the questions most directly relevant to the *Witt* inquiry. Similar to the questions we reviewed in *Riccardi*,[10] these questions called for responses that could adequately inform the trial court whether a prospective juror was substantially impaired within the meaning of *Witt*.

---

[10] In *Riccardi*, we identified two questions on the form that were directly relevant to the *Witt* standard: "Question No. 65 asked: 'Could you set aside your own personal feelings regarding what the law ought to be and follow the law as the court explains it to you?' " (*Riccardi*, *supra*, 54 Cal.4th at p. 780.) "Question No. 68 asked: 'Do you have such an opinion concerning the death penalty that, regardless of the evidence that might be developed during the penalty phase of the trial . . . you would automatically and absolutely refuse to vote for the death penalty in any case?' " (*Ibid*.)

24

Regarding question No. 59(C), Prospective Juror No. 16 stated that if the case proceeded to the penalty phase, he would "probably" refuse to vote for the death penalty and automatically vote for life in prison without possibility of parole regardless of the evidence. He wrote in response to question No. 59(E) that he "possibly" would change his answer to question No. 59(C) if the court instructed and ordered him to consider the aggravating and mitigating evidence before voting on the appropriate penalty. When asked in question No. 59(F) whether he could set aside his personal feelings about the law and follow the court's instructions on the law, Prospective Juror No. 16 wrote, "Yes — most probably."

At the hearing on the challenge for cause, the trial court noted that "[Prospective Juror] No. 16 states that he is a CTF captain; strongly opposes the death penalty; probably would disregard the evidence and vote for life without possibility of parole under any circumstances, although the other questions were sufficiently within the ballpark of rationality and responsibility." The prosecutor challenged the prospective juror for cause based on the prospective juror's stated feelings that the death penalty should be abolished and the state does not have a right to take a life and that the prospective juror did not commit to follow the law in deciding this case. Defendant's counsel argued the prospective juror's written responses were equivocal and that oral, in-person voir dire was warranted. The trial court dismissed Prospective Juror No. 16 for cause.

Based on our independent review of the record, Prospective Juror No. 16's questionnaire responses to the crucial *Witt* inquiries were ambiguous, failed to provide an adequate basis to support his excusal for cause, and called for the trial court to conduct oral voir dire. Granted, Prospective Juror No. 16's responses indicated intense personal opposition to the death penalty, e.g., "the state does not have the right to take a life in revenge for the crime the person commits," and "I oppose it completely." Crucially, however, his written answers to the *Witt*

25

inquiries under question No. 59 were equivocal and suggested his death penalty views were not unalterable.

Prospective Juror No. 16 wrote in response to question No. 59(C) that he would "probably" automatically refuse to vote for the death penalty and automatically vote for life in prison without possibility of parole regardless of the evidence, but "possibly" would change that answer if the court instructed him to consider the aggravating and mitigating evidence before deciding penalty. Similarly, in response to question No. 59(F), he wrote that he "yes — most probably" could set aside his personal feelings about the law and follow the court's instructions. Nothing in the foregoing written responses obviated the need for oral voir dire or supported a finding that Prospective Juror No. 16's opposition to the death penalty was so strong that he was unwilling to set aside his personal views and perform the duties of a capital juror in accordance with the law. Indeed, elsewhere in his questionnaire, Prospective Juror No. 16 suggested that he would consider the evidence and was open to voting for either penalty. He wrote that consideration of a defendant's background would be helpful in deciding penalty, that he would not "automatically" reject such evidence in deciding penalty, and that the sole fact defendant may have children "would [not] preclude [him] personally from imposing the penalty of death."

The trial court had an obligation to resolve the uncertainties in Prospective Juror No. 16's written responses and orally examine him in person to the extent necessary to permit a reliable determination of whether he was disqualified under *Witt*. (*Leon, supra*, 61 Cal.4th at p. 592; *Riccardi*, *supra*, 54 Cal.4th at p. 782; *Stewart*, *supra*, 33 Cal.4th at p. 445.) This case is not like *People v. Russell* (2010) 50 Cal.4th 1228, 1263, in which we affirmed a for cause dismissal based on questionnaire responses alone of a prospective juror who stated that he " would 'probably' follow the law as the judge instructed" but " was 'not absolutely certain

26

[he] would.' " The prospective juror in that case "clarified, 'I am strongly opposed to the death penalty,' and stated he 'simply would not vote for' death, and that no matter the evidence, he would 'ALWAYS vote for life without the possibility of parole.' " (*Ibid.*) We held that the trial court properly excused the prospective juror because his written questionnaire responses were clear, unequivocal, internally consistent, and demonstrated that he was " 'unwilling to temporarily set aside [his] own beliefs and follow the law.' " (*Id.* at p. 1262.) Here, in contrast, Prospective Juror No. 16's questionnaire answers were ambiguous and did not clearly demonstrate that his death penalty views would prevent or substantially impair the performance of his duties as a capital juror. Therefore, we conclude the trial court erred in excusing the prospective juror based solely on his questionnaire answers and without followup questioning on voir dire. (*Witt*, *supra*, 469 U.S. at p. 424; *Leon*, *supra*, 61 Cal.4th at p. 592.)

"The general rule is that, absent a showing of prejudice, an erroneous excusal of a prospective juror for cause does not mandate the reversal of judgment. This rule is based on the principle that a '[d]efendant has a right to jurors who are qualified and competent, not to any particular juror.' (*People v. Holt* (1997) 15 Cal.4th 619, 656.) But . . . under existing United States Supreme Court precedent, the erroneous excusal of a prospective juror for cause based on that person's views concerning the death penalty *automatically* compels the reversal of the penalty phase without any inquiry as to whether the error actually prejudiced defendant's penalty determination. (*Gray, supra*, 481 U.S. at pp. 659-667 (opn. of the court); *id.*, at pp. 667-668 (plur. opn. of Blackmun, J.); *id.*, at p. 672 (conc. opn. of Powell, J.).)" (*Riccardi*, *supra*, 54 Cal.4th at p. 783.)

Accordingly, we are compelled by *Gray* to reverse defendant's penalty phase verdict, and we need not resolve defendant's remaining challenges to the

excusals for cause of Prospective Jurors Nos. 11, 12, 39, and 50 based solely on their questionnaire responses.

### 2. *Adequacy of the Written Questionnaire*

Citing *Witt*, *supra*, 469 U.S. at page 424, defendant contends that by not specifically asking the prospective jurors whether they "could consider voting for the death penalty if they were under an oath to do so," the questionnaire failed to provide an adequate basis for excusing a prospective juror for cause based solely on questionnaire responses. Because we already have concluded the trial court's error in dismissing Prospective Juror No. 16 for cause based solely on his questionnaire responses requires reversal of the penalty phase judgment, we decline to address this claim.

### 3. *Jury Selection Method*

Before jury selection commenced, the trial court explained that it would use a variation of the "jury box" method of jury selection[11] in which the prospective jurors would be called and questioned in groups of 18 and the parties would exercise both for cause and peremptory challenges before a new group was called. Defense counsel objected to the requirement that he exercise peremptory challenges as each group was questioned, claiming he could not effectively exercise peremptory challenges until all the groups had been passed for cause. In overruling the objection, the trial court noted, "I think you're confusing your

---

[11] In *People v. Avila* (2006) 38 Cal.4th 491, 537 (*Avila*), we explained that "[u]nder the 'jury box' method, which is the system utilized in California, 12 prospective jurors are questioned, subjected to challenges for cause, and replaced until 12 qualified jurors remain. Both sides then exercise peremptory challenges. A juror removed by peremptory challenge is replaced by another juror, who is then questioned and challenged both for cause and peremptorily. This process continues until peremptory challenges have been exhausted or waived."

28

ability to pick a jury of people who can give you a fair trial with your desire to hand pick a jury that is going to do what you want it to do."

On appeal, defendant contends that the jury selection method used at his trial impaired trial counsel's ability to effectively exercise peremptory challenges, in violation of his federal constitutional right to a fair and impartial jury, and requires reversal of his death judgment. Defendant's claim is foreclosed by our decision in *Avila*, *supra*, 38 Cal.4th at page 538. There, we explained that "[a]lthough knowledge of the composition of the entire panel can be relevant to the exercise of a peremptory challenge against an individual juror, the fact that a particular procedure used might have made exercising initial peremptory challenges less informed does not in itself require reversal. [Citation.] [¶] A court commits reversible error if its procedures *deny* a party's right of peremptory challenge." (*Id*. at p. 538, italics added; see *Pointer v. United States* (1894) 151 U.S. 396, 412 ["The right of peremptory challenge . . . is not of itself a right to *select*, but a right to *reject*, jurors" (italics added)].) The trial court did not prevent defendant from exercising his allotted peremptory challenges. Therefore, defendant cannot demonstrate a violation of his federal constitutional rights. (*Avila*, at p. 538.)

### *4. Trial Court's Refusal to Conduct Individual Voir Dire*

Defendant contends the trial court erred by refusing to conduct sequestered individual death qualification voir dire. The claim is without merit.

In response to a pretrial writ filed by defendant in this case, the Court of Appeal held in essence, that under Code of Civil Procedure section 223, a trial court has discretion to conduct sequestered individual death qualification of prospective jurors, based on its determination concerning whether group voir dire is " 'practicable.' " (*Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168,

29

1180.) In *People v. Waidla* (2000) 22 Cal.4th 690, 713, we endorsed this ruling and do so again here. Defendant makes no persuasive case for us to reconsider the issue.

### 5. *Asserted Unconstitutionality of Death Qualification of the Jury*

Defendant contends that the death qualification process in jury selection is unconstitutional under the federal and state Constitutions. As a threshold matter, his failure to make a timely and specific objection on this ground in the trial court forfeited the issue on appeal. (See *People v. Jennings* (2010) 50 Cal.4th 616, 687-688.) In any event, the high court and this court have rejected this claim. (*Lockhart v. McCree*, *supra*, 476 U.S. at pp. 176–177; *People v. Lenart* (2004) 32 Cal.4th 1107, 1120; see *People v. Tully* (2012) 54 Cal.4th 952, 1066.) Defendant offers no persuasive argument to revisit the issue as to our state Constitution, and we decline to do so.

### B. Guilt Phase Issues

#### 1. *Use of Stun Belt*

Over defendant's objections, the trial court ordered that he be restrained with a REACT (remote electronically activated control technology) stun belt[12] during trial. On appeal, defendant contends the trial court abused its discretion in ordering him to wear the stun belt and thereby violated his state and federal constitutional rights. We conclude the contention is without merit.

---

[12] "[T]he remote electronically activated control technology (REACT) belt" is a "battery-operated belt ' "consist[ing] of a four-inch-wide elastic band, which is worn underneath the prisoner's clothing." ' [Citation.] If activated by its remote transmitter, the belt can deliver a brief 50,000-volt electric shock." (*People v. Lomax* (2010) 49 Cal.4th 530, 560, fn. 8 (*Lomax*).)

## a. Background

Before jury selection began, a deputy sheriff submitted a memorandum to the court suggesting that defendant wear a REACT belt during the trial. The deputy also provided a packet of materials that included defendant's numerous disciplinary reports from the jail and explanatory material from the manufacturer concerning use of the REACT belt system.

The disciplinary reports revealed that on December 13, 1995, defendant yelled at prosecution witness Jose Luis Ramirez in the booking area. On February 11, 1996, defendant became argumentative and hostile, and kicked and banged on his cell door when he was told that he could not be moved to another cell. On January 14, 1997, defendant was discovered acting suspiciously near a dayroom door, and was found in possession of a straightened paper clip. Defendant admitted that he was trying to pick the lock of the dayroom door. The reports also discussed disciplinary incidents that occurred on three additional dates in 1996, involving defendant's possession of prisoner-made weapons (June 30 and July 13) and an assault on a deputy during an escape attempt (Aug. 18).

Counsel objected to any requirement that defendant wear a REACT belt on the ground that defendant had not posed any security risk in his prior court appearances. Counsel also expressed concern that there might be an accidental activation of the stun belt or activation triggered by nonthreatening slight or sudden movement.

The trial court ordered use of the REACT belt because "the indications of previous actions that . . . defendant has taken raise a serious concern as to the viability of having him completely unrestrained in the courtroom." The trial court stated: "With respect to previous appearances in court and lack of problems, [defendant] has always been shackled, hand and foot, when he's been brought to court. The problem we face with a jury format is that, in order to avoid any

31

untoward appearance of dangerousness or likelihood of fleeing, we will not be having [defendant] restrained. He will be dressed in civilian clothes, and we will make every effort to remove any aura of a custody … from his appearance in court. It seems to me that the use of the belt is [a] legitimate and reasonable insurance policy against him taking action towards escape or towards assaulting anybody or anything of that nature. [¶] I will specifically instruct the bailiff that the — and of course the bailiff knows this already — that the system is not to be activated unless there's some kind of emergency going on. If he scratches his nose or makes a sudden movement, if it doesn't amount to something really serious of course, there will be no problem and no action will be taken. [¶]… [¶] So tentatively at this point the Court intends, based upon the indications of the previous incidents, the indications of previous actions that this defendant has taken raise a serious concern as to the viability of having him completely unrestrained in the courtroom." The trial court informed counsel that it would revisit the issue of using the stun belt if, for example, it could not be worn without being conspicuous.

Before jury selection commenced, counsel raised the issue of the stun belt: "I have no doubts about this Court's judgment about the use of the react system; however, I just again want to note for the record . . . that I think there are less invasive ways to do it . . . ." The trial court acknowledged counsel's objection.

### b. Discussion

"In general, the 'court has broad power to maintain courtroom security and orderly proceedings' (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269), and its decisions on these matters are reviewed for abuse of discretion. [Citation.] However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, 'a defendant cannot be subjected

32

to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' (*People v. Duran* (1976) 16 Cal.3d 282, 290-291.) Similarly, the federal 'Constitution forbids the use of visible shackles … unless that use is "justified by an essential state interest" — such as the interest in courtroom security — specific to the defendant on trial.' (*Deck v. Missouri* (2005) 544 U.S. 622, 624, italics omitted.) We have held that these principles also apply to the use of an electronic 'stun belt,' even if this device is not visible to the jury. (*People v. Mar* (2002) 28 Cal.4th 1201, 1219.)" (*Lomax*, *supra*, 49 Cal.4th at pp. 558-559.)

" 'In deciding whether restraints are justified, the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." (*Deck v. Missouri*, *supra*, 544 U.S. at p. 629.) These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' (*People v. Gamache* (2010) 48 Cal.4th 347, 367.) Although the court need not hold a formal hearing before imposing restraints, 'the record must show the court based its determination on facts, not rumor and innuendo.' [Citation.] The imposition of physical restraints without evidence of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion." (*Lomax*, *supra*, 49 Cal.4th at p. 559.)

On appeal, defendant does not challenge the court's finding of a manifest need for restraint. Instead, defendant argues that in deciding what restraint to employ, the trial court erred by failing to consider less restrictive physical restraints and the adverse psychological impact of the stun belt on him.

In general, "when physical restraints are called for, a trial court should impose 'the least obtrusive or restrictive restraint' that will ensure effective security." (*Lomax*, *supra*, 49 Cal.4th at p. 562.) Here, the trial court stated that it

33

would not use shackles to restrain defendant because it wanted to "avoid any untoward appearance" that he was dangerous or a flight risk. It believed the stun belt was a "legitimate and reasonable insurance policy" against defendant taking any action toward escape or violence, and that the device could be used inconspicuously under defendant's clothing. When counsel expressed concern that defendant feared the device might be accidentally activated, the trial court explained that it would specifically instruct the bailiff to avoid doing so absent "some kind of emergency going on." Moreover, the trial court informed counsel that it would revisit the use of the stun belt as a restraint should any problem arise during trial.

"In *People v. Mar*, *supra*, 28 Cal.4th at pages 1225-1230, we examined the potential psychological consequences of wearing a stun belt and the physical effects from electric shock in subjects with certain medical conditions. However, recognizing that our decision was the first to consider use of the REACT belt in California criminal trials, we expressly stated that our discussion of these topics was offered to provide guidance 'in *future* trials.' (*Id*. at p. 1225, italics added.)" (*Lomax*, *supra*, 49 Cal.4th at p. 562.) Defendant's trial occurred four years before we decided *Mar*. In ordering the use of the stun belt, the trial court addressed defendant's fear that the device would be accidentally activated, which is one of the risks we identified in *Mar* that trial courts should consider before requiring a defendant to wear a stun belt. (See *People v. Mar*, *supra*, 28 Cal.4th at pp. 1225-1226.) We will not fault the trial court in this case for failing to consider the other potential psychological consequences subsequently identified in *Mar*. (See *Lomax*, *supra*, at p. 562; see also *People v. Bryant, Smith, and Wheeler* (2014) 60 Cal.4th 335, 391 (*Bryant, Smith, and Wheeler*).) In sum, the court did not abuse its discretion in ruling that use of the stun belt was appropriate in these circumstances.

## 2. Instruction on Claim-of-Right Defense

### a. Instruction on claim-of-right defense

Defendant contends the trial court on its own motion should have instructed the jury concerning the claim-of-right defense based on evidence that defendant thought he was helping Sanchez regain his own property from the Morales residence.[13] We disagree.

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) In *People v. Tufunga* (1999) 21 Cal.4th 935, 950 (*Tufunga*), this court affirmed that, as at common law, claim of right remains a viable defense to a charge of robbery. "The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*Id*. at p. 938.) A trial court, however, is not required to instruct on the defense " 'unless there is evidence to support an inference that [the defendant] acted with a subjective belief he or she had a lawful claim on the property.' " (*Id*. at p. 944.) We concluded that the trial

---

**13** The current instruction regarding a claim-of-right defense, CALJIC No. 9.44, provides, in relevant part: "An essential element of the crime of [robbery] [theft by larceny] [burglary, where the entry is alleged to have been committed with the intent to commit theft] is a specific intent permanently to deprive the alleged victim of his or her property. That specific intent does not exist if the alleged perpetrator had a good faith claim of right to title or ownership of the specific property taken from the alleged victim. In other words, if a perpetrator seeks to regain possession of property in which [he] [she] honestly believes [he] [she] has a good faith claim of ownership or title, then [he] [she] does not have the required criminal intent. [¶] … [¶] [A good faith belief by a defendant, tried as an accomplice, that [he] [she] was assisting [his] [her] co-principal retake the co-principal's property negates the required criminal intent for [robbery] [theft by larceny] [burglary, where it is alleged the entry was to commit theft].]"

court prejudicially erred by denying the defendant's request to instruct on claim of right on the ground the evidence did not support giving the instruction. (*Id.* at p. 957.)

In *People v. Williams* (2009) 176 Cal.App.4th 1521, the Court of Appeal extended the claim-of-right defense to an accomplice charged with burglary and robbery who believed in good faith that he was helping a principal, his brother, retake the principal's own property, a car and a laptop, from the victim, the principal's former girlfriend. (*Id.* at pp. 1525, 1527-1529.) The *Williams* court explained that "[i]t would defy logic and common sense to hold that a defendant who absconds with goods by force under a good faith belief that he was repossessing his own property does not thereby commit robbery, but that his accomplice, who assists him in the same act and shares the same intent, may be found guilty. The latter, just as surely as the former, lacks the specific intent to deprive another of his or her property." (*Id.* at p. 1528.) Therefore, the Court of Appeal concluded that "a good faith belief by a defendant, tried as an accomplice, that he was assisting his coprincipal retake the principal's property negates the 'felonious intent' element of both larceny and robbery, and that an instruction on the claim-of-right defense must be given where substantial evidence supports such a belief." (*Id.* at pp. 1528-1529.) It held the trial court erred in refusing the defendant's request to instruct on the claim-of-right defense, because he testified that he believed he was assisting a coprincipal obtain the co-principal's own property and "ample evidence," including a bill of sale for the car that was in the principal's name, supported a jury finding that he had a good faith basis for that belief. (*Id.* at p. 1529.)

Here, in addition to *Tufunga* and *Williams*, our decision in *People v. Anderson* (2011) 51 Cal.4th 989, 996 (*Anderson*) provides helpful guidance, particularly because unlike the defendants in *Tufunga* and *Williams*, defendant did

36

not request a claim-of-right instruction. In *Anderson*, we held that a trial court does not have a duty to instruct on its own motion on the defense of accident, so long as the jury received complete and accurate instructions on the mental state element of the charged offense. (*Anderson*, at p. 996.) As we explained, " '[i]n criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.] That duty extends to ' "instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on … , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " ' " (*Ibid*.) "But ' "*when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking sua sponte instructional duties*. While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request." ' (*People v. Saille* (1991) 54 Cal.3d 1103, 1117.)" (*Id*. at pp. 996-997, first italics added.)

In *Anderson*, because the defense of accident served only to negate the mental state element of the charged offense, the trial court's obligation to instruct on the defense "extended no further than to provide [the jury] an appropriate pinpoint instruction upon request by the defense." (*Anderson*, *supra*, 51 Cal.4th at p. 998.) In *People v. Hussain* (2014) 231 Cal.App.4th 261, 269, the Court of Appeal applied *Anderson's* rationale to a claim-of-right defense and held that because the claim-of-right defense serves only to negate the mental state required for grand theft, the trial court was not required to instruct on the defense on its

37

own motion. (See also *People v. Lawson* (2013) 215 Cal.App.4th 108, 117 ["the rationale of *Anderson* applies with equal force to the defense of mistake of fact, or any other defense that operates only to negate the mental state element of the crime"].) We agree with the Court of Appeal in *Hussain* that *Anderson's* rationale applies to the defense of claim of right.[14] Accordingly, here, because the asserted claim of right served only to negate the intent to steal element of the robbery charges and the trial court otherwise properly instructed the jury on this element, it was not required to instruct on the defense in the absence of a request by trial counsel.

Notwithstanding our conclusion that the trial court was not obligated to instruct on its own on claim of right, we also conclude there was no substantial evidence that supported the defense. Defendant points to the fact that he stated in the videotape he made after he fled to Mexico that Sanchez wanted "to go pick up some things that were left in the [Morales] house." The good faith belief in a claim of right, however, must relate to specific property (*Tufunga*, *supra*, 21

---

[14] In *People v. Russell* (2006) 144 Cal.App.4th 1415, 1431, decided before our decision in *Anderson*, the Court of Appeal held that the trial court prejudicially erred by failing to instruct on its own motion on the defenses of claim of right and mistake of fact because both defenses "were implicated by defendant's claim that he did not have the requisite knowledge that the [property] was stolen because at all times he held a good faith belief that it had been abandoned," and the evidence in support was substantial. *Russell* reasoned that even though the defendant did not request mistake of fact or claim-of-right instructions, "the trial court had a sua sponte duty to instruct on both of these defenses if it appeared defendant was relying on the defenses, or if there was substantial evidence supportive of the defenses and they were not inconsistent with defendant's theory of the case." (*Ibid.*) The Court of Appeal, however, failed to apply the exception we recognized in *People v. Saille*, *supra*, 54 Cal.3d at page 1117, and subsequently applied in *Anderson,* that the trial court's sua sponte instructional duties do not extend to defenses that serve only to negate an element of the crime. Therefore, we disapprove *Russell* to the extent it is inconsistent with our decision today.

38

Cal.4th at p. 950), and "be something more than a vague impression" (*People v. Photo* (1941) 45 Cal.App.2d 345, 353). In contrast to the defendant in *Williams* who provided proof of the items he intended to reclaim for his brother, defendant never identified *what* "things" in particular he intended to retrieve for Sanchez.

In addition, by admitting in his videotaped statement that Ramirez "was looting the house" and "grabbing things and leaving with them," defendant implicitly conceded that the items taken by Ramirez and placed in his (defendant's) car (e.g., VCR, stereo equipment) belonged to the victims. Further, there was no evidence that Sanchez (or defendant) claimed an ownership interest in the two handguns *defendant* took from a box in the kitchen. For these reasons, we conclude the record does not disclose substantial evidence that defendant believed in good faith that he was assisting Sanchez in obtaining Sanchez's own property from the Morales house. Therefore, even upon request, defendant was not entitled to instruction on a claim-of-right defense. (See also *People v. Barnett* (1998) 17 Cal.4th 1044, 1145 [claim-of-right defense not available where defendant "simply seized whatever items of value" he could get from robbery victims "without any regard to whether such items came from [the individual] who supposedly owed him a debt, or from one of the others, who indisputably did not"]; *People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1022 [the trial court's refusal to give instruction on claim-of-right defense was proper where defendants "conducted a general ransacking of the bedroom indiscriminately taking items of value never specifically related to any claim of right"].)

39

### b. Asserted robbery instruction errors

Defendant contends that the standard robbery instruction given, CALJIC No. 9.40,[15] was defective because it did not require the jury to find that the perpetrator took "property that was not his own." Defendant also contends that the robbery instruction erroneously omitted language conveying the idea that the perpetrator intended to permanently deprive "the owner" of the property. Defendant's contentions fail on the merits because they incorrectly elevate the claim of right *defense* to the level of an element of the offense of robbery.

Section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Cf. § 484, subd. (a) ["Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another . . . is guilty of theft."].) *Tufunga* affirmed this court's long-standing view that "a felonious taking, that is, a taking done with *the intent to steal another's property*, is a required element at the core of every robbery." (*Tufunga*,

---

**15** The trial court instructed the jury as follows: "The defendant is accused in Counts 6, 7, 8 of having committed the crime of robbery, a violation of Section 212 of the Penal Code. [¶] Every person who takes personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent to permanently deprive that person of the property is guilty of the crime of robbery in violation of Section Penal Code Section 212. [¶] Immediate presence means an area within the alleged victim's reach, observation or control, so that he or she could, if not overcome by violence or prevented by fear, retain possession of the subject property. [¶] Against the will means without consent. [¶] In order to prove this crime, each of the following elements must be proved: [¶] One, a person had possession of property of some value, however slight; [¶] Two, the property was taken from that person or from his or her immediate presence. [¶] Three, the property was taken against the will of that person. [¶] Four, the taking was accomplished either by force or fear. [¶] And five, the property was taken with the specific intent permanently to deprive that person of the property."

40

*supra*, 21 Cal.4th at 948, italics added.) Crucially, as Justice Mosk observed, "It is significant that the section [defining robbery] requires the taking be from the *possession* of another, and *makes no reference whatever to ownership of the property*." (*People v. Butler* (1967) 65 Cal.2d 569, 576, (dis. opn. of Mosk, J.), second italics added, overruled on other grounds by *Tufunga*, *supra*, 21 Cal.4th at p. 956.) "Moreover, the person from whom the property is taken qualifies as a victim of larceny [or robbery] even though he does not have the right of possession as against the true owner.' (Wharton's Criminal Law, (15th ed.1995) § 381, pp. 454-456, fns. omitted.)" (*People v. Smith* (2009) 177 Cal.App.4th 1478, 1490.) "It is no defense to a charge of robbery (or of theft) that the victim was not the true owner of the property taken." (*People v. Moore* (1970) 4 Cal.App.3d 668, 670; *People v. Hamilton* (1995) 40 Cal.App.4th 1137, 1143 ["robbery may be committed against a person who is not the owner of property — indeed, it may be committed against a thief"].) Nor is "[k]nowledge of owner identity . . . an element of robbery." (*People v. Prieto* (1993) 15 Cal.App.4th 210, 214.)

Contrary to defendant's arguments, this is not a case where the instruction on the charged offense omitted an element of the offense. In *People v. Cummings* (1993) 4 Cal.4th 1233, 1312, footnote 53, this court cited with approval a nearly identical version of CALJIC No. 9.40 to that given in this case, which requires in relevant part a finding that " 'the property was taken with the specific intent permanently to deprive that person of the property.' " We observed that it is "the instruction most often given, [and] defines the crime [of robbery] and separately defines the elements." (*Cummings*, at p. 1312, fn. 53.) Because CALJIC No. 9.40, as given, conformed to the statutory definition under section 211 and

41

correctly included all the elements of the crime,[16] it was incumbent upon defendant to request clarification of the instruction to the extent he deemed ownership of the property taken to be an issue in his case. (See part II.B.2.a, *ante*; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 ["A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial."]; *People v. Hardy* (1992) 2 Cal.4th 86, 153 ["[B]ecause the instruction given was correct, it was incumbent on defendants to request clarifying language. Their failure to do so waived the issue."]; see also *People v. Jones* (1996) 42 Cal.App.4th 1047, 1055 [because CALJIC No. 9.40 states all the elements of robbery, it was incumbent on the defendant to request clarifying language regarding asportation if he deemed the element to be in issue at trial].) Defendant's failure to request clarifying language forfeits the issues on appeal.

### 3. Unanimity Instruction

The prosecution presented evidence of four takings that occurred during the home invasion robbery at the Morales house: (1) the VCR and stereo equipment Ramirez took from the victims and placed in defendant's car; (2) the .32-caliber handgun that Sanchez gave to Ramirez, who took the gun when he fled (3) the necklace and hair oil product that Ramirez took from the victims and kept when he fled; and (4) the two handguns that defendant took from a box near the kitchen. Defendant contends that because the jury could have based its convictions for

---

**16** Defendant asserts "[t]he CALCRIM robbery instruction (CALCRIM No. 1600) implicitly repudiated CALJIC No. 9.40… ," but provides no authority for the proposition. We have cautioned that "jury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)

42

robbery on any of the four takings, the trial court erred by failing to instruct the jury that it must agree unanimously on the specific taking that constituted the robberies charged in counts 6 through 8. As a result, defendant contends, his robbery convictions and "all the robbery-based convictions" must be reversed. The claim is without merit.

Preliminarily, defendant did not request that the trial court give a unanimity instruction on the robbery charges based on the assertedly discrete takings.[17] The issue is not forfeited, however, because "[e]ven absent a request, the court should give [a unanimity] instruction 'where the circumstances of the case so dictate.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1199 (*Riel*).)

In a criminal case, "the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Yet "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Ibid.*) "In deciding whether to give the

---

[17] CALJIC No. 17.01, the standard unanimity instruction, provides: "The defendant is accused of having committed the crime of [in Count ___]. The prosecution has introduced evidence for the purpose of showing that there is more than one [act] [or] [omission] upon which a conviction [on Count ___] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of the [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count ___], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."

instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id.* at p. 1135.) Jury unanimity is not required as a matter of federal due process. (*People v. Wilson* (2008) 44 Cal.4th 758, 801-802 [the prosecution presented two theories of murder, direct perpetrator or aider and abettor, (citing *Schad v. Arizona* (1991) 501 U.S. 624 (plur. opn. of Souter, J.))].)

Defendant does not dispute that this case concerns a single home invasion robbery that gave rise to a separate robbery charge for each homicide victim, Ramon, Martha, and Martinez (counts 6–8, respectively). (See *People v. Scott* (2009) 45 Cal.4th 743, 750 (*Scott*). "[M]ultiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken." (*Ibid.*, citing *People v. Ramos* (1982) 30 Cal.3d 553, 589.)[18] Rather, defendant argues that a unanimity instruction was required because there was evidence that multiple items of property were taken and the prosecutor relied on several theories of liability for the taking of those items. Ramirez testified that Sanchez told him to take whatever he could from the house. Ramirez took the VCR, stereo equipment, neck chain, hair oil product, and a .32-caliber handgun. He also testified that defendant took two handguns from a box near the kitchen. He explained that he put the VCR and speaker equipment in the trunk of defendant's car and that Sanchez gave him the .32-caliber handgun during the

---

[18] We noted in *Scott* that "*Ramos* overruled an older line of cases, including *People v. Guerin* (1972) 22 Cal.App.3d 775, which held that the forcible taking of a single item from multiple victims could result in only a single conviction of robbery." (*Scott, supra*, 45 Cal.4th at p. 750, fn. 4.)

robbery.  Ramirez also admitted that he took the hair oil product, neck chain, and .32-caliber handgun when he fled the house.  The prosecution argued that defendant was guilty of the charged offenses as a direct perpetrator or under aider and abettor and coconspirator theories of liability.

Defendant argues that our decision in *People v. Davis* (2005) 36 Cal.4th 510 (*Davis*), compels the conclusion the trial court erred in failing to provide a unanimity instruction.  In *Davis*, the defendant and his accomplices, some of whom were armed, commandeered a car occupied by the driver and a passenger. (*Id*. at p. 519.)  It was night, and the four men drove around with both victims in the car.  (*Ibid*.)  The four stopped the car near a high school, and the defendant, armed with a Uzi, took the passenger into a nearby field and fatally shot her. (*Ibid*.)  Defendant returned, and he and one of the accomplices took the driver into the field.  (*Ibid*.)  Defendant fatally shot the driver.  (*Ibid*.)  Two rings the passenger always wore were later found in the possession of defendant and his accomplices.  (*Id*. at p. 520.)

On appeal, the defendant challenged his conviction for robbery of the passenger on the ground that a unanimity instruction was required given he faced one charge of robbery but evidence of two robberies was presented.  (*Davis*, *supra*, 36 Cal.4th at p. 560.)  We reversed the robbery conviction on the ground that the defendant was entitled to a unanimity instruction because the evidence showed two distinct acts of robbery constituting the charged crime — the taking of the car from the driver and passenger and the taking of the rings from the passenger.  (*Id.* at pp. 561-562.)  Importantly, "the potential defenses to the two acts of robbery were *entirely different*."  (*Id*. at p. 562, italics added; cf. *People v. Stankewitz* (1990) 51 Cal.3d 72, 100 [no unanimity instruction is required "when the defendant offers essentially the same defense to each of the acts and there is no reasonable basis for the jury to distinguish between them"].)  Defendant claimed

the passenger "was not legally in possession of the car," and the taking of the rings "constituted only the lesser included crime of theft" on the ground that there was evidence defendant formed the intent to steal the passenger's rings after he killed her. (*Davis*, at p. 562.) Based on the evidence, some jurors may have had a reasonable doubt that the intent to take the rings was formed while the passenger was alive; others may have had a reasonable doubt whether the passenger was in possession of the driver's car. (*Id*. at p. 561.) We concluded that because "there was evidence from which the jury could have found defendant guilty of robbery based on the car but not the rings," the trial court's failure to provide a unanimity instruction was prejudicial. (*Id*. at p. 562.)

As *Davis* makes clear, however, a unanimity instruction is not required if "the defendant offered the same defense to both acts constituting the charged crime, so no juror could have believed defendant committed one act but disbelieved that he committed the other, or because 'there was no evidence … from which the jury could have found defendant was guilty of' the crime based on one act but not the other." (*Davis*, *supra*, 36 Cal.4th at p. 562; see, e.g., *Riel*, *supra*, 22 Cal.4th at p. 1199 [a unanimity instruction was not required on the robbery charge because the defense as to each act of robbery was the same, i.e., "defendant was asleep in the backseat of the car and did not participate in any act of robbery"].) Even assuming that the events in this case may properly be parsed into multiple discrete takings, defendant did not offer "entirely different" defenses to each taking as the defendant did in *Davis*. (*Davis*, at p. 562.)

Defendant's main argument was that Ramirez testified untruthfully about defendant's involvement in the crimes. Defendant argued that he had no idea what would occur at the Morales house and was not part of a conspiracy to rob the Morales family. He denied there was a plan to commit a robbery before they arrived at the Morales house. Granted, defendant's alleged taking of the handguns

46

from a box in the kitchen does appear to differ in nature from the other three takings described above, because defendant was allegedly himself the perpetrator. Nonetheless, this difference does not translate to a meaningful difference in the defenses such that the jury could have found defendant guilty of personally taking the handguns, but not guilty of aiding and abetting the takings by Ramirez. Defendant's defense to *all* of the takings was to accuse Ramirez of testifying untruthfully. Specifically, defendant did not deny that Ramirez took the neck chain, hair oil, .32-caliber handgun that Sanchez handed him, and VCR. Instead, defendant argued that Ramirez was lying when he testified that defendant helped in taking those items and personally took the two handguns from the box in the kitchen. If the jury believed defendant, it would have found him not guilty of robbery of either the items taken by Ramirez or the handguns taken from the kitchen. "It is inconceivable that a juror would believe [Ramirez]'s testimony" that defendant stole the handguns from the kitchen, but "somehow find" Ramirez was untruthful in relating defendant's involvement in the taking of the neck chain, hair oil, gun, and VCR and thus find defendant guilty of robbery based on the taking of the handguns, but not the other items. (*Riel*, *supra*, 22 Cal.4th at p. 1200.) Therefore, as in *Riel*, "this *is* 'a case where the jury's verdict[s] impl[y] that it did not believe the only defense offered.' " (*Ibid*.)

Accordingly, a unanimity instruction was not required.

### 4. *Burglary Instruction*

The trial court instructed the jury on three theories of burglary: "Every person who enters any building with the specific intent to [(1)] steal, take away, carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of that property or with the specific intent to [(2)] commit robbery or [(3)] murder is guilty of the crime of

47

burglary in violation of Penal Code Section 459." (See also § 459 ["Every person who enters any house … with intent to commit grand or petit larceny or any felony is guilty of burglary."].)[19] The jury was also instructed under the felony-murder rule that "[e]very person who unlawfully kills a human being …during the commission or attempted commission of burglary or robbery is guilty of the crime of murder in violation of Section 187 of the Penal Code."

Defendant contends that the instructions erroneously permitted the jury to convict him of burglary felony murder based solely on entry into the Morales residence with an intent to kill, in violation of *People v. Garrison* (1989) 47 Cal.3d 746, 778 (*Garrison*), which applied the merger doctrine explained in *People v. Ireland* (1969) 70 Cal.2d 522 (*Ireland*), and *People v. Wilson* (1969) 1 Cal.3d 431 (*Wilson*). He contends the instructions violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and require reversal of his conviction for burglary felony murder and the burglary felony-murder special circumstance finding. We agree that the instructions erroneously permitted the jury to find defendant guilty of felony murder based on entry into the Morales residence with an intent to kill, but as we explain, the error was harmless.

In *Ireland*, this court held that a second degree felony-murder conviction cannot be premised on an assault or any "felony which is an integral part of the homicide." (*Ireland*, *supra*, 70 Cal.2d at p. 539.) We explained that to allow use of the felony-murder rule in cases where a homicide was committed as a result of

---

**19**     Specifically, the jury was instructed that it must find the following elements in order to convict defendant of burglary: "One, a person entered a building. And two, at the time of the entry that person had the specific intent to steal and take away someone else's property, and intended to deprive the owner permanently of that property. Or at the time of the entry, that person had the specific intent to commit the crime of robbery or murder."

an assault "would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault — a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law." (*Ibid*.)

In *Wilson*, *supra*, 1 Cal.3d at page 442, we extended *Ireland's* merger doctrine to first degree felony murder "when the underlying felony is burglary based upon an intention to assault the victim of the homicide with a deadly weapon." In *Garrison*, *supra*, 47 Cal.3d at page 778, this court held that under the merger doctrine, "an entry with the specific intent to commit murder cannot support a [burglary] felony-murder conviction."

In *People v. Farley* (2009) 46 Cal.4th 1053, 1121 (*Farley*), we expressly overruled *Wilson*, concluding that the opinion in *Wilson* "erred in extending the merger doctrine to first degree felony murder." (*Id.* at p. 1117.) We reasoned, among other things, that "[b]ecause the power to define crimes lies exclusively with the Legislature, our decision in *Wilson*, *supra*, 1 Cal.3d 431, erred in narrowing the Legislature's clear and specific definition of first degree murder." (*Farley*, 46 Cal.4th at p. 1119.) *Farley's* overruling of *Wilson* is to be applied prospectively only (*id*. at p. 1122), and therefore, because the homicides in this case occurred before our decision in *Farley*, we apply our jurisprudence governing at the time of the crimes, that is, *Garrison*.

Under *Garrison*, "if the jury relied on entry with intent to kill as the basis" for finding defendant guilty of burglary, "the burglary could not provide a basis for application of the felony-murder rule, for the burglary was an integral part of and included in fact within the homicide." (*Garrison*, *supra*, 47 Cal.3d at p. 778.) In this case, the above instruction erroneously permitted the jury to convict

defendant of burglary felony murder based solely on entry into the Morales residence with intent to kill.

The error is harmless, however, and reversal of the first degree murder convictions or burglary-murder special-circumstance finding is not required, "[i]f other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for" burglary premised on entry with an intent to steal or commit a robbery. (*People v. Chun* (2009) 45 Cal.4th 1172, 1205 (*Chun*); *Farley*, *supra*, 46 Cal.4th at p. 1116, fn. 22; see *Hedgpeth v. Pulido* (2008) 555 U.S. 57 (per curiam) [error involving instructing the jury on multiple theories of guilt, one of which is invalid, is subject to harmless error review].) Here, the verdicts and evidence demonstrate the error was harmless.

The prosecution's evidence established that defendant, Sanchez, Ramirez, and Nunez went to the Morales house to steal property *and* to kill Ramon and anyone else present. As detailed earlier, on the day of the homicides, defendant drove Sanchez, Nunez, and Ramirez to, among other places, the foothills east of Salinas to test-fire their loaded rifles. Defendant and Sanchez talked about the plan to enter the house, get drugs, steal "stuff," *and* kill those inside so that there would be no witnesses. When they arrived at the house, defendant volunteered to knock on the front door because no one in the house knew him. When nobody answered, defendant opened the door. Once they were inside, Sanchez held Martinez, who had been sleeping on the living room floor, at gunpoint, while Ramirez and Nunez searched the house for property to take. Ramirez took the items to defendant's car. After the Morales family returned and the adult victims were subdued by the four men, defendant searched for guns and found two handguns, at least one of which was a .38-caliber handgun. He kept one gun and put the other in Sanchez's jacket. The victims were subsequently shot inside the home and all were killed except for the infant.

50

Also, as observed above, defendant did not testify in his defense, but in a videotaped statement offered by the prosecution, defendant admitted that he went to the Morales house "to pick up some things" Sanchez had left there. Defendant also admitted that they took guns into the house, he was one of the shooters, and "we shot like crazy."

The jury found defendant guilty of robbing each homicide victim (counts 6-8), burglary (count 9), and conspiracy to commit burglary and robbery (count 10). The jury also found true the robbery felony-murder special circumstance allegations. By these verdicts and findings, the evidence presented, the prosecution's theory of the case, and the instructions given, the jury necessarily found that that defendant entered the house with Sanchez, Ramirez, and Nunez with the specific intent to steal or commit robbery. (Cf. *People v. Ramirez* (2006) 39 Cal.4th 398, 462-464 [although evidence that defendant entered the residence with the intent to commit murder or assault could not support a felony-murder conviction under the *Ireland* merger doctrine, evidence that one of defendant's purposes in entering the victims' residence was to steal was sufficient to uphold convictions for burglary and burglary felony-murder and the burglary felony-murder special-circumstance finding].) Thus, there is no reasonable doubt that the jury made the determinations necessary for a proper finding of burglary felony murder and burglary felony-murder special circumstance, and hence, the error in instructing on the invalid theory was harmless beyond a reasonable doubt. (*Chun*, *supra*, 45 Cal.4th at p. 1205.)

### 5. Identification of Trailer

#### a. Introduction

Defendant was charged in count 10 with conspiracy to commit burglary, robbery, and murder. As discussed below, two of the six overt acts alleged in

51

support of the conspiracy charge, overt acts numbers three and four, related to an arson allegedly committed by defendant, Sanchez, and Nunez, but not Ramirez, on or about the day before the homicides.

The prosecution's arson theory was that (1) Angel Martinez (Angel) hired defendant, Sanchez, and Nunez to commit an arson of a truck owned by Juan Martinez Avalos (Avalos), because he had a business dispute with Avalos; (2) Angel lived in trailer No. 35 at the 101 Trailer Park in Salinas; (3) on the day of the homicides, the four men went to that trailer, and Sanchez collected a $100 bill as payment for committing the arson; and (4) on the day of the homicides, the men drove to JKD Shooting Sports and with the $100 received for committing the arson, purchased ammunition for weapons used in the crimes committed at the Morales residence.

Defendant contends that the trial court erred in admitting nonverbal hearsay evidence through the testimony of investigator Moore concerning the out-of-court identifications of trailer No. 35 made by Avalos and Ramirez. Defendant asserts that he was prejudiced by admission of the identifications, because it was the sole evidence that linked defendant, Sanchez, and Nunez to the arson of Avalos's truck. Defendant claims that admission of the identifications violated his federal constitutional rights to confrontation, due process of law, and reliable guilt and penalty determinations. As we explain, inclusion of the arson language in the allegations of overt acts numbers three and four was immaterial. Nonetheless, the claim fails.

### b. Background

The information alleged six overt acts under count 10, which charged defendant with conspiracy to commit burglary, robbery, and murder. The third overt act alleged was that "[o]n or about November 15, 1994, Francisco Antonio

52

Sanchez, Daniel Sanchez Covarrubias, and Joaquin Nunez committed an arson for hire and received $100 for committing the arson." The fourth overt act alleged was that "[o]n or about November 16, 1994 Francisco Antonio Sanchez, Daniel Sanchez Covarrubias, Joaquin Nunez, and Jose Luis Ramirez drove to JKD Shooting Sports in the City of Salinas to purchase (with the $100 received from the arson) ammunition and supplies for the rifles to be used in the residential robbery, burglary and killing at the Morales residence at 1022 East Market Street in the City of Salinas."

Ramirez testified that, on the day of the homicides, he, defendant, Sanchez, and Nunez went to a trailer park to collect $100 owed to Sanchez. Ramirez showed investigator Moore a trailer at the 101 Trailer Park on North Main Street where Sanchez collected the money. Defendant and the others waited in or near defendant's car while Sanchez collected the payment.

Avalos testified that in November 1994, he was a business partner with a man named Angel, who lived at the 101 Trailer Park in Salinas. Avalos and Angel had a business disagreement. In the early morning hours of November 16, Avalos discovered his truck had been set on fire. He found a half-gallon-plastic bottle near the truck. Avalos reported the incident to police, and he was subsequently contacted by investigator Moore. Avalos told Moore about the disagreement with Angel and identified the trailer where Angel lived.

Arturo Perez testified that he was acquainted with Angel and knew he lived in the same trailer park as his mother. Perez had introduced Sanchez to Angel.

Investigator Moore testified that he interviewed Ramirez and learned that in the afternoon of the day of the homicides, Sanchez collected $100 at a trailer in the 101 Trailer Park in Salinas. Over trial counsel's hearsay objection, Moore testified that Ramirez told him the payment was related to a vehicle burning in Salinas sometime during the evening prior to the homicides. The trial court

admonished the jurors that the portion of Moore's testimony relating Ramirez's statements about the nature of the debt could not be considered for its truth but instead, only to explain his follow-up investigation after he contacted Ramirez. Moore subsequently took Ramirez to the trailer park in order to have him identify the trailer where Sanchez collected $100. Over trial counsel's hearsay objection, Moore testified that Ramirez pointed to trailer No. 35.

Investigator Moore testified further that after he interviewed Ramirez, he contacted the Salinas Police Department and inquired whether there had been a vehicle arson reported on either November 15 or 16. Over objection by counsel, the trial court permitted Moore to testify that he determined that Avalos reported to the Salinas Police Department that his truck was burned on November 15 or 16. The trial court admonished the jurors that they could not consider Moore's testimony relating Avalos's statements in the police report as proof that Avalos's truck was burned and that it constituted arson but instead, only to explain Moore's investigation. Moore testified that based on his findings, he contacted Avalos and discussed the burning of Avalos's truck.

Over further objection by trial counsel, Moore testified that he took Avalos to the 101 Trailer Park and asked Avalos whether he knew people there. Avalos pointed to a trailer marked No. 35. The prosecutor then asked Moore, "Was this the same [trailer] that Jose Luis Ramirez had pointed out to you as being where they collected the $l00?" Moore answered, "That's correct."

### c. Discussion

Defendant contends that investigator Moore's testimony relating Ramirez's and Avalos's identifications of trailer No. 35 constituted inadmissible hearsay. He argues, in essence, that by pointing to a specific trailer, both Ramirez and Avalos were communicating to Moore, and the trial court erred by admitting their out-of-

54

court communications for their truth. We agree with defendant that Moore's testimony constituted inadmissible hearsay, but we conclude defendant was not prejudiced by admission of the trailer identifications.

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) A "[s]tatement" includes "nonverbal conduct of a person intended by [the person] as a substitute for oral or written verbal expression." (Evid. Code, § 225.) "For purposes of the hearsay rule, conduct is assertive if the actor at the time intended the conduct to convey a particular meaning to another person." (*People v. Jurado* (2006) 38 Cal.4th 72, 129.)

Here, Avalos pointed to trailer No. 35 in response to investigator Moore's question whether he "knew people" who lived in the 101 Trailer Park. Thus, Avalos's act of pointing was intended as a substitute for an oral expression that "I know the person who lives at trailer No. 35." Similarly, during his interview with Moore, Ramirez pointed to trailer No. 35 in response to Moore's question regarding where Sanchez collected his $100 payment. Thus, Ramirez intended his act of pointing to the trailer to substitute for an oral expression that "Sanchez was paid $100 at trailer No. 35." In each circumstance, the prosecution offered Avalos's and Ramirez's act of pointing for the truth of the meaning each intended to convey to Moore in answer to his questions, and therefore their act of pointing was assertive conduct and hearsay. (See *People v. Mayfield* (1972) 23 Cal.App.3d 236, 240-241 [a declarant's conduct of pointing to a photograph in response to a question is assertive conduct and constitutes hearsay].)

On appeal, the People argue the statements did not amount to hearsay because they were not offered for the truth of the identifications (i.e., Avalos knew someone who lived at trailer No. 35, and Sanchez collected a $100 debt from

someone who lived at trailer No. 35) but instead, for the fact that Avalos and Ramirez identified the same trailer. The People did not argue this ground for admission at trial. In any event, the fact that the witnesses may have pointed to the same trailer would not have been relevant to any disputed factual issue, unless the jury also considered *why* they pointed to the trailers — that is, the truth of the hearsay identifications.

Because the two identifications of trailer No. 35 were out-of-court nonverbal statements intended as substitutes for oral expression and offered for their truth, Moore's testimony relating the identifications constituted hearsay. We note no other theory of admissibility was offered by the prosecution. Therefore, we conclude that the trial court abused its discretion in admitting the evidence.[20] But the error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [error is harmless under state law unless it is reasonably probable that a result more favorable to defendant would have occurred absent the error]; *People v. Duarte* (2000) 24 Cal.4th 603, 618-619 [the *Watson* standard is applicable to state law error in admission of hearsay].) The identifications made by Ramirez and Avalos did not directly establish that Sanchez collected the $100 payment at the trailer *as payment for burning Avalos's truck*. Indeed, the trial court admonished the jurors that they could consider Moore's testimony relating statements made by Ramirez (i.e., Sanchez was paid $100 for the vehicle burning that occurred during the evening prior to the homicides) and Avalos (i.e., Avalos's police report that his truck was burned on or about November 15 or 16) for the purpose of explaining the steps Moore took during his follow-up investigation, but not as proof that

---

[20]    Because we have concluded the identifications testimony was inadmissible hearsay, we need not address defendant's claims that the court should have excluded the testimony under Evidence Code section 352 as unduly prejudicial, a basis that he did not advance at trial.

Sanchez received $100 as payment for committing an arson, that an arson was committed, or that Avalos was the victim of an arson. We presume jurors follow the trial court's instructions." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1115 .) Hence, there was *no* substantive evidence admitted from any of the witnesses who testified regarding the trailer identifications that established the nature of the debt owed Sanchez was payment for arson.

In addition, although Avalos's testimony established that he had a business dispute with Angel and that his (Avalos's) truck was set on fire, there was no evidence that established *he* believed Angel was responsible for the arson or otherwise connected Angel to the arson. Further, contrary to what defendant implies in his reply brief, the prosecutor did not offer Avalos's identification of trailer No. 35 "to prove that Avalos believed the party responsible for the arson resided in Trailer 35," and made no such argument to the jury. For these reasons, there is no reasonable probability that absent this vague evidence — that the trailer Ramirez identified as the one that Sanchez visited on the day of the homicides to collect a $100 debt was the same one that Avalos identified as the home of a person he knew, i.e., Angel — the jury would have reached a more favorable verdict.

Next, defendant argues essentially that absent evidence of the hearsay trailer identifications made by Ramirez and Avalos, and given the trial court's admonitions precluding the jury's consideration of the statements these witnesses made to investigator Moore during the investigation as proof an arson occurred, there was insufficient evidence to prove alleged overt acts numbers three and four of the conspiracy charge. As a result, defendant contends that his conspiracy conviction should be reversed because it may have been based on overt acts unsupported by legally sufficient evidence. We disagree.

57

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416 § 184.) Although a unanimous jury must agree that an overt act was committed, it need not unanimously agree on the same overt act in order to convict for conspiracy. (*Russo*, *supra*, 25 Cal.4th at p. 1135.) Further, an immaterial variance in the proof at trial from the overt act alleged in the charging document does not vitiate a conspiracy verdict if the evidence proves the "gist" of the overt act, and the defendant was sufficiently informed of the offense with which he was charged and has not been misled in making his defense. (*People v. Guerrero* (1943) 22 Cal.2d 183, 186 (*Guerrero*) [holding that "[t]he *taking* of the prosecutrix to the specified places constituted the gist of the overt acts relied upon as evidencing the defendants' formation of the conspiracy, and the presence or absence of compulsion in effecting such removal added nothing to the sufficiency of that accusation"]; *People v. Rodriguez* (1923) 61 Cal.App. 69, 80-81 (*Rodriguez*) [regarding charge of conspiracy to commit burglary, it was sufficient to allege as an overt act that the conspirators attempted "to enter the office of [a] mining company"; allegation of the means employed by them for that purpose, i.e., to "pick the lock of the door of the office" was "unimportant and immaterial" and therefore, "surplusage"]; see also *People v. Maury* (2003) 30 Cal.4th 342, 427 [rejecting the defendant's claim that variance between pleading and proof on a charge of rape under § 261, former subd. (2) (now subd. (a)(2)) violated his constitutional rights to notice and due process; allegation of rape " 'by means of force and fear' " in the amended information did not describe an offense different from "rape by means of violence" in jury instruction].)

Regarding alleged overt act number three, quoted above, Ramirez testified that on the day of the homicides, Sanchez collected $100 as payment for a debt while defendant, Nunez, and Ramirez waited in the car. As explained above, there was no substantive evidence introduced that any arson was committed. Nonetheless, applying the test for materiality of the variance between the allegation of overt act number three and the proof introduced at trial, the absence of substantive evidence that defendant, Sanchez, and Nunez committed an arson for hire could not affect the conspiracy verdict. (*Guerrero, supra*, 22 Cal.2d at p. 187.) First, the gist of overt act number three was that on or about the day before the homicides, Sanchez obtained $100. The means by which Sanchez obtained the money was immaterial. As alleged in overt act number four, discussed below, Sanchez simply applied the money toward the purchase of ammunition for rifles the four men intended to use to commit burglary, robbery, and homicide at the Morales residence; again, the source of the funds had no bearing on the transaction. (*Id.*, at p. 186; *Rodriguez, supra*, 61 Cal.App. at p. 81.) Second, it cannot be said that defendant was misled in making his defense or otherwise prejudiced by inclusion of the immaterial arson language in the allegation of overt act number three. (*Guerrero, supra*, at p. 187; *Rodriguez, supra*, at p. 81.) For these reasons, the variance between the information and the prosecution's proof regarding the commission of an arson was immaterial. Therefore, we conclude that even absent substantive evidence of an arson, there was sufficient evidence to substantiate alleged overt act number three.

Regarding the allegation of overt act number four, set forth above, the testimony of Ramirez and Fletcher, a clerk at JKD Shooting Sports, and evidence of the purchase receipt, taken together, established that on or about the day of the crimes, the four men went to JKD Shooting Sports and, with the $100 that Sanchez collected at the trailer, bought ammunition for rifles they

59

intended to use to commit the crimes at the Morales house. For the reasons stated in the preceding section concerning alleged overt act number three, the variance between the allegation in overt act number four that the four men intended to purchase ammunition "with the $100 received from the arson" and the prosecution's absence of proof of an arson also was immaterial. (*Guerrero, supra*, 22 Cal.2d at p. 187; *Rodriguez, supra*, 61 Cal.App. at p. 81.) The gist of this alleged overt act was that the four men went to JDK Shooting Sports to purchase, with the $100 Sanchez had collected, ammunition for the weapons they planned to use to commit the crimes at the Morales residence. Therefore, we conclude that even though the prosecution offered no substantive evidence of an arson, there was sufficient evidence to substantiate alleged overt act number four.

Finally, defendant's confrontation clause claim lacks merit. Even assuming Avalos's and Ramirez's out-of-court statements of identification to investigator Moore were testimonial within the meaning of *Crawford v. Washington* (2004) 541 U.S. 36, 53, their admission did not violate defendant's confrontation rights because Avalos and Ramirez were subject to cross-examination at trial. (*Id.* at p. 59, fn. 9 ["we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements"].)

### 6. *Assault and Attempted Murder Convictions*

Defendant contends there was insufficient evidence to support his convictions for attempted murder (count 4) and assault with a firearm (count 5) of Alejandra. As we explain, sufficient evidence supports each conviction.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence

that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]… We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623; accord, *People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*Smith*, at p. 739.) Express malice requires a showing that the assailant either desires the victim's death or knows to a substantial certainty that the victim's death will occur. (*Ibid.*)

Concerning the crime of assault with a firearm, "[s]ection 245, subdivision (a)(2), punishes '[a]ny person who commits an assault upon the person of another with a firearm.' Assault is defined as 'an unlawful attempt, *coupled with a present ability*, to commit a violent injury on the person of another.' (§ 240, italics added.) 'Once a defendant has attained the means and location to strike immediately he has the "present ability to injure." ' " (*People v. Licas* (2007) 41 Cal.4th 362, 366-367.)

Defendant contends a "personal shooting theory cannot be used to uphold the conviction[s] [for attempted murder and assault]" because the jury could not reach a unanimous verdict on the allegation he personally used a .38-caliber handgun within the meaning of former section 12022.5, subdivision (a).

61

Assertedly, the evidence is insufficient to find that he personally shot baby Alejandra. We disagree.

"[T]here is no prohibition against considering all of the evidence in the record to determine the sufficiency of evidence on one count merely because the jury did not reach a unanimous verdict on a count to which the evidence may have related." (*People v. Consuegra* (1994) 26 Cal.App.4th 1726, 1734, fn. 6.) The failure of the jury to reach a verdict on the allegation that defendant personally used a .38-caliber handgun "may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict. " (*People v. Lewis* (2001) 25 Cal.4th 610, 656.) "The United States Supreme Court has explained: '[A] criminal defendant … is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. *Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient.*' (*United States v. Powell* (1984) 469 U.S. 57, 67.)" (*Ibid.*, italics added; see also § 954 ["An acquittal of one or more counts shall not be deemed an acquittal of any other count."].)

Based on our independent review of the record, we conclude there is no reason to reverse defendant's convictions for the crimes committed against Alejandra merely because the jury did not reach a unanimous verdict on the personal use of a .38-caliber handgun allegation. The evidence is sufficient to support defendant's convictions for attempted murder of and assault with a firearm on Alejandra, based on the theory he was the direct perpetrator of those crimes.

The totality of the evidence established that Sanchez was armed with the AR-15 rifle, Nunez was armed with the .30-30 rifle, and defendant was armed with a .38-caliber handgun. Salinas Police Officer Timothy McLaughlin testified that long rifles such as an AR-15 and .30-30 ordinarily require two hands to operate. After defendant gave Sanchez one of the two handguns he found in a box in the kitchen, he went into the bedroom where Nunez had forced Martha to remain with her baby. Because defendant's fingerprint was found on the box of .38-caliber ammunition in the bedroom, the jury reasonably could infer that the second gun defendant found was a .38-caliber handgun, that he loaded it with ammunition from this box, and that he used this gun to shoot the victims.[21]

As defendant explained in his videotaped statement, after the first gunshot was fired, "*We* fired the weapons that *we* had" and "shot really like crazy." The jury could reasonably conclude that at that point, defendant had put into action his plan with Sanchez to eliminate all witnesses to the burglary and robbery, that is, to kill everyone inside the house. Defendant intentionally fired his handgun three times at close range toward Martha and Alejandra. The jury reasonably could infer that Martha and Alejandra were shot at about the same time and that Alejandra was in her mother's arms when defendant shot Martha in her forehead and shot Alejandra in the left shoulder and leg. "The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill." (*People v. Houston* (2012) 54 Cal.4th 1186, 1218.) Here, defendant discharged his .38-caliber handgun multiple times from close range in a manner

---

[21]     In the alternative, the jury reasonably could have found that because Ramirez testified only that he "thought" the handgun defendant put in Sanchez's pocket was a .38-caliber handgun, Ramirez was mistaken in identifying the gun defendant gave to Sanchez and that defendant possessed a .38-caliber handgun.

that could have inflicted a mortal wound on Alejandra, like the mortal wounds actually inflicted on her mother. Therefore, the jury could reasonably conclude that defendant had acted with the requisite intent to kill when he shot the baby, and thereby convict him of attempted murder.

Further, because the gunfire had lasted about a half a minute, the jury reasonably could infer that defendant acted purposefully and without delay in loading his weapon and shooting Martha and Alejandra in the bedroom. These additional circumstances lend further support to the jury's implied finding that defendant acted with intent to kill the baby when he shot her. (See *People v. Arias* (1996) 13 Cal.4th 92, 162 ["if the jury found defendant's use of a lethal weapon with lethal force was purposeful, an intent to kill could be inferred, even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance"]; see also *Smith*, *supra*, 37 Cal.4th at p. 742 ["even if the shooting was not premeditated, with the shooter merely perceiving the victim as 'a momentary obstacle or annoyance,' the shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill"].)

Finally, the jury also reasonably could find that defendant completed an assault with a firearm of Alejandra. (See *People v. Wright* (1968) 258 Cal.App.2d 762, 767 ["If a firearm is deliberately and unlawfully fired toward another person in a manner likely to produce great bodily injury the offense of assault with a deadly weapon is complete."].)

64

Accordingly, we conclude a rational jury could find beyond a reasonable doubt that defendant, as a direct perpetrator, attempted to kill Alejandra and assaulted her with a firearm.[22]

### 7. Asserted Prosecutorial Misconduct

At the beginning of the closing argument at the guilt phase, the prosecutor stated: "We have laws, criminal laws, that we've set up in our country, and they are basically the norms, the standards that we, as a civilized society, live by. They're rules that apply, not only to you and me, but they also apply to him, to the defendant. And your job as jurors in this case is to conduct that litmus test to apply the laws that we, as a civilized society, have and determine whether or not the defendant has broken any of those laws. Determine whether or not we, as a civilized society — you, as the jurors who are making this decision — will tolerate the conduct of this man."

Near the conclusion of her argument, the prosecutor stated: "You need to look at this evidence. You need to sift through it. Every item there tells a story, every item of evidence. And, you know, things like that little jumper, that little sleeper that [baby] Alejandra was wearing, doesn't lie. All it can do is tell you the truth. It is as it is. [¶] That green jacket, look at it. It doesn't lie. The bullets that went through each of these victims, each of them, tells a story. It is incumbent upon you. You are responsible to determine that story, to use the evidence that you've received in this case and determine the charges. [¶] *Again, as I mentioned, your job and your responsibility as jurors is to act as the litmus test, to apply the*

---

[22] Because we affirm defendant's conviction for attempted murder and assault with a firearm on the theory that he was the actual perpetrator of those crimes, we need not consider whether the evidence is sufficient to convict him of those crimes under an alternative theory of liability.

65

*laws of our society, and to determine what our community will and will not tolerate*."

Trial counsel objected that the above italicized portion of the prosecutor's closing argument was "an improper statement of the law." The trial court overruled the objection and admonished the jury as follows: "Well, counsel is permitted to present to you, as I've said, their theory of the case. They're permitted to comment on the facts. They're permitted to comment on the law. [¶] What they say is not evidence. And what they say about the law is not the law. You have to follow my instructions on that. [¶] They're permitted to comment on both of those areas. This particular comment is somewhat beyond the law. But it is still within the realm of permissible comment."

On appeal, defendant contends that the prosecutor's remarks about the jurors acting as the "litmus test . . . to determine what our community will and will not tolerate" constituted misconduct because in advocating this approach, she appealed to the jurors' passions. He asserts the argument deprived him of his state and federal constitutional rights to due process, a fair trial, and reliable guilt and penalty verdicts. As we explain, there was no misconduct.

Preliminarily, defendant's claim is forfeited because he did not object on the specific ground of prosecutorial misconduct that he now asserts on appeal. " 'As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Valencia* (2008) 43 Cal.4th 268, 281, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. McDowell* (2012) 54 Cal.4th 395, 436.) At trial, counsel objected that the prosecutor's comments constituted a misstatement of law. For the first time on appeal, defendant complains that the prosecutor's comments constituted an improper

66

appeal to the passions of the jury.  The trial court was not presented with this specific argument and hence, had no opportunity to rule on the issue.  We therefore conclude the issue is forfeited on appeal.  In any event, defendant's claim is without merit.

" 'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process."  [Citations.]  In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."  [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Clark*, *supra*, 52 Cal.4th at p. 960.) " 'It is, of course, improper [for the prosecutor] to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742-743.)  We consider the assertedly improper remarks in the context of the argument as a whole.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.)  "In conducting [our] inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements."  (*People v. Frye* (1998) 18 Cal.4th 894, 970.)

Here, the complained-of remarks simply repeated what the prosecutor explained at the beginning of her argument was the function of the jury, i.e., to determine whether defendant had broken any laws.  Defendant argues that "[b]y charging the jurors with the responsibility to express the will of 'civilized society' the prosecutor sought to incite the jurors to look beyond the legal and evidentiary issues and reach a verdict simply because [defendant] was part of the group that

67

committed the charged crimes." To the contrary, the prosecutor informed the jurors that they were to apply the law in resolving the question of defendant's guilt. In making the "litmus test" and "what our community will and will not tolerate" comments, the prosecutor permissibly reminded the jurors that they had to take responsibility for completing the arduous task of sifting through the evidence to determine the story each item told, consider the charges, and ultimately decide whether defendant had violated any laws. There was nothing in the prosecution's remarks that urged the jurors to act on their passions or prejudice. (See, e.g., *People v. Cornwell* (2005) 37 Cal.4th 50, 92 ["the prosecutor's argument did not urge the members of the jury to act on the basis of their fear of chaos and crime in the community, but to act with an understanding of the importance of law in the abstract"]; see also *U.S. v. Monaghan* (D.C. Cir. 1984) 741 F.2d 1434, 1442 ["a request that the jury 'condemn' an accused for engaging in illegal activity is not constitutionally infirm, so long as it is not calculated to excite prejudice or passion"].)

### 8. *Instruction on Voluntary Intoxication*

Defendant requested that the trial court give a series of instructions on voluntary intoxication[23] in support of his defense that he lacked the mental state required of an aider and abettor. In denying the request, the trial court found that there was evidence defendant was drinking on the day of the crimes but no evidence of the amount of alcohol he had consumed. The court added that "[t]here is no evidence to the effect that he was inebriated to the point that his ability to

---

[23] Defendant requested CALJIC Nos. 4.20 (Voluntary Intoxication — Not a Defense to General Intent Crimes), a modified version of 4.21 (Voluntary Intoxication — When Relevant to Specific Intent), 4.21.1 (Voluntary Intoxication — Trial With General and Specific Intent Crimes), and 4.22 (Voluntary Intoxication — Defined).

form the specific intents or mental states might be affected in his own videotaped statement as to the salient portions of the events of November 16th. [¶] He makes no reference to intoxication. [¶] He seems to have recall of the events of what occurred, why they occurred." Trial counsel was permitted to add further to the record and stated that several witnesses testified regarding defendant's alleged intoxication, that is, he was "drunk" and "intoxicated." Counsel submitted that the evidence was sufficient to permit the jury to decide whether "he had the capacity to form the specific intent."

Out of an abundance of caution, the trial court instructed the jury under a modified version of CALJIC No. 4.21.1, as follows: "It is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of this condition. [¶] Thus in the crimes and enhancements alleged, the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve the defendant of responsibility for the crime. [¶] However, there is an exception to this general rule, namely, where a specific intent is an essential element of a crime. In that event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required specific intent at the time of the commission of the alleged crime. [¶] Thus, in the crimes and enhancements alleged, where a necessary element is the existence in the mind of the defendant of a certain specific intent, that element will be included in the definition of the crimes set forth elsewhere in these instructions. [¶] If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not the defendant had the required specific intent. [¶] If from all evidence you have a reasonable doubt whether the defendant had that specific intent, you must find that the defendant did not have that specific intent."

69

Defendant contends this voluntary intoxication instruction was erroneous because it told the jury that evidence of intoxication could be considered in determining whether he formed the required intent of a specific intent crime but precluded consideration of his intoxication in evaluating whether he formed the requisite mental state of an aider and abettor, i.e., knowledge of and intent to aid the perpetrator's unlawful purpose. As a result, he asserts the instruction effectively withdrew his intoxication defense on the required mental state for aiding and abetting. In addition, defendant contends, the instruction precluded the jury's consideration of intoxication evidence as it related to the special circumstance findings under CALJIC 8.80.1, intent to kill or reckless indifference to human life. Defendant asserts the instructional error violated his federal and state constitutional rights to due process, to present a defense, confrontation, a jury trial, and a nonarbitrary capital sentencing process. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7 & 15.)

Defendant relies on *People v. Mendoza* (1998) 18 Cal.4th 1114, 1133 (*Mendoza*), in which we held that "[d]efendants may present evidence of intoxication solely on the question whether they are liable for criminal acts as aiders and abettors."[24] As we explained in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 186 (*Letner and Tobin*), *Mendoza* concluded "(1) evidence of voluntary intoxication is relevant to the extent it establishes whether an aider and abettor knew of the direct perpetrator's criminal purpose and intended to facilitate achieving that goal, even in cases in which the perpetrator intended to commit a 'general intent' crime [citation]; and (2) any instructions to the jury concerning voluntary intoxication should inform the jury of the possible effect of voluntary

---

[24] We filed our decision in *Mendoza* on August 13, 1998, after defendant's trial commenced, but before the jury rendered its guilt phase verdicts.

70

intoxication upon the aider and abettor's mental state ([*Mendoza*] at p. 1134 ['a trial court has no sua sponte duty to instruct on the relevance of intoxication, but if it does instruct, as the court here did, it has to do so correctly'])."

In *Letner and Tobin*, we assumed that the trial court's instructions, which predated *Mendoza*, failed to adequately explain to the jury how voluntary intoxication could affect the mental state of an aider and abettor.  (*Letner and Tobin*, *supra*, 50 Cal.4th at p. 187.)  Quoting *Mendoza*, *supra*, 18 Cal.4th at pages 1134-1135, we explained preliminarily that "we 'review the instructions as a whole to determine whether it is "reasonably likely the jury misconstrued the instructions as precluding it from considering" the intoxication evidence in deciding aiding and abetting liability.  [Citation.]  Any error would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error:  "the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant." ' "  (*Letner and Tobin*, at p. 187.)

Applying these principles, we concluded that any error was harmless:  "Although the voluntary intoxication instructions did not specifically mention aiding and abetting, they did not *preclude* the jury's use of evidence of intoxication in evaluating whether defendants aided and abetted, that is, whether, pursuant to the trial court's other instructions, one defendant knew of the other defendant's criminal purpose and intentionally aided the commission of the crime. Nor did the prosecutor argue that the jury could not consider voluntary intoxication in determining whether a defendant who was an aider and abettor of the crimes formed the mental state required for aiding and abetting.  There is nothing in the record to indicate the jury would not have understood that the mental states set forth in the voluntary intoxication instructions could apply both to the mental states required of a direct perpetrator and to those required of an

71

aider and abettor. . . . For these reasons, any error in the instructions did not preclude the jury's consideration of defense evidence, nor is it reasonably probable that different instructions would have resulted in a verdict more favorable to defendants." (*Letner and Tobin*, *supra*, 50 Cal.4th at p. 187.)

Here, the defense theory was defendant's denial of any knowledge of or intent to further the alleged plan to rob and murder. Trial counsel argued that "[i]t is not unreasonable to assume that [defendant], himself, really didn't believe that anything serious was going to happen. . . . What happens to him when he's had too much to drink? He gets happy. He's the kind of guy that, he wants to dance. Does that sound like a person who intended to kill the Moraleses that evening? I think not. Amy Trejo said [defendant] was a nice guy. She said she could never, ever imagine that he would do anything like this."

Similar to the situation in *Letner and Tobin*, although the trial court's alternate intoxication instruction was not clear in identifying for the jury the mental states that could be affected by defendant's intoxication, any error was harmless. There is nothing in the instruction that informed the jury that the intent elements set forth in the specific intent crimes could apply to only the mental states required of a direct perpetrator but not to those required of an aider and abettor. The trial court did not prohibit counsel from arguing, as he did at the hearing on the matter and pursuant to the instructions he requested, that evidence of intoxication was relevant to whether defendant had formed the requisite mental state as an aider and abettor to the specific intent crimes. During argument, counsel expressly asserted that defendant had no knowledge of any plan to rob and murder because he had been drinking: defendant "had too much to drink" and did not think "anything serious was going to happen." Counsel himself did not limit the argument to the issue of defendant's guilt as a direct perpetrator and the jury reasonably would have understood it applied to the determination of defendant's

72

liability as an aider and abettor. In addition, nothing prohibited trial counsel from arguing that the jury could consider evidence of defendant's intoxication in determining, under CALJIC No. 8.80.1, whether he intended to kill or acted with reckless indifference.

Further, the record reveals that the jury necessarily resolved the factual issues presented by the omitted language[25] adversely to defendant. Defendant was found guilty of conspiracy to commit burglary and robbery as alleged in count 10. The jury was instructed under CALJIC No. 6.10 in relevant part that conspiracy requires "*the specific intent to agree* to commit the crime of burglary or robbery or murder . . . and with the further *specific intent to commit one or more of those crimes. . . .*" (*Italics added.*) Hence, in finding defendant had the specific intent *to agree* with the coparticipants to commit burglary and robbery and the specific intent *to commit* burglary and robbery, the jury impliedly found that notwithstanding the evidence of intoxication, defendant had *knowledge* of their intent to commit burglary and robbery and also formed the *specific intent* to commit these crimes. Therefore, the jury "found [defendant] was not so

---

**25** The "mental state" language omitted from the modified version of CALJIC No. 4.21.1 provided by the trial court appears in the bracketed portions, as follows: "However, there is an exception to this general rule, namely, where a specific intent [or] [mental state] is an essential element of a crime. In that event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required specific intent [or] [mental state] at the time of the commission of the alleged crime. [¶] Thus, . . . where a necessary element is the existence in the mind of the defendant of a certain specific intent [or] [mental state], that element will be included in the definition of the crimes set forth elsewhere in these instructions. [¶] If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not the defendant had the required specific intent [or] [mental state]. [¶] If from all evidence you have a reasonable doubt whether the defendant had that specific intent [or] [mental state], you must find that the defendant did not have that specific intent [or] [mental state]."

intoxicated as to be unable to form the required mental states" of an aider and abettor to the burglary and robberies; "consequently, a more favorable outcome had [the intoxication instruction been modified to expressly apply to the mental states of an aider and abettor] was not reasonably probable." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 97 (*Coffman and Marlow*); see also *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [error in omitting instruction on lesser included offense was harmless when the factual question posed by that instruction "was necessarily resolved adversely to the defendant under other, properly given instructions"].)

For these reasons, any instructional error did not preclude the jury's consideration of defendant's intoxication evidence on the question of his liability as an aider and abettor. We conclude it is not reasonably probable that different instructions would have resulted in an outcome more favorable to defendant.

### 9. *Instructions Involving Accomplice Liability and the Natural and Probable Consequences Doctrine*

The prosecution relied on, among other theories, the natural and probable consequences doctrine to establish defendant's guilt as an aider and abettor, and/or a coconspirator for the charges of murder (counts 1-3), attempted murder (count 4), and assault with a firearm (count 5). The jury was instructed on this doctrine under CALJIC Nos. 3.02, 6.11, and 8.66. Defendant contends that these instructions were defective because they did not include language that required the jury to determine the natural and probable consequences of the crimes from the perspective of a reasonable person in the defendant's position. Defendant asserts that the instructional deficiencies require reversal of his convictions on the above charges. As we explain, reversal of defendant's convictions is not required.

74

*a. The natural and probable consequence doctrine instructions*

*(i) CALJIC No. 3.02*

The trial court gave a modified version of CALJIC No. 3.02, the pattern jury instruction concerning aider and abettor liability under the natural and probable and consequences doctrine, as follows:  "One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime or crimes, but is also guilty of *any other crime committed by a principal which is a natural and probably* [*sic*] *consequence of the crimes originally aided and abetted*.  [¶]  In order to find the defendant guilty of the crime of murder as charged in Counts 1, 2 and 3 on this theory, you must be satisfied beyond a reasonable doubt, that:  [¶] One, the crimes of burglary or robbery were committed; [¶]  Two, . . . [¶]  That the defendant aided and abetted in those crimes;  [¶]  [Three,]  [t]hat a co-principal in one . . . or more of those crimes committed a murder.  [¶]  And four, *that the crime of murder was a natural and probable consequence of the commission of the crimes of robbery or burglary*.  [¶]  You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you were satisfied beyond a reasonable doubt and unanimously agreed that the defendant aided and abetted the commission of an identified target crime and that *the crime of murder was a natural and probable consequence of the commission of that target crime*."  (Italics added.)

*(ii) CALJIC No. 6.11*

The trial court instructed with CALJIC No. 6.11, which explained the nature of joint conspiratorial responsibility, as follows:  "Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if that act or declaration is in furtherance of the object of the conspiracy.  [¶]…[¶]  A member of a conspiracy is not only guilty of the particular crime that to his knowledge his confederates agreed to and did

75

commit, but is liable also for *the natural and probable consequences of any crime or act of a co-conspirator* to further the object of the conspiracy even though that crime or act was not intended as a part of the agreed upon objective, and even though he was not present at the time of the commission of that crime or act. [¶] You must determine whether the defendant is guilty as a member of a conspiracy to commit the originally agreed upon crime or crimes, and if so, whether the crime or crimes alleged was or were perpetrated by a co-conspirator in furtherance of that conspiracy, and was or were *a natural and probable consequence of the agreed upon criminal objective of that conspiracy*." (Italics added.)

### (iii) CALJIC No. 8.66

The trial court instructed the jury on the elements of attempted murder under CALJIC No. 8.66. The instruction was modified to include the following instruction on aider and abettor liability for attempted murder under the natural and probable consequences doctrine: "In order to find the defendant guilty of attempted murder on an aiding and abetting theory, the attempted murder must be *a natural and probable consequence of a criminal act which the defendant knowingly and intentionally encouraged*." (Italics added.)

### b. Discussion

As observed in the above quoted pattern instructions, under the natural and probable consequences doctrine, "[a]n aider and abettor is guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime." (*People v. Smith* (2014) 60 Cal.4th 603, 611.) Moreover, "[a] consequence that is *reasonably foreseeable* is a natural and probable consequence under this doctrine. 'A nontarget offense is a " 'natural and probable consequence' " of the target offense if, judged objectively, the additional offense

76

was reasonably foreseeable." (*Ibid*.) "The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable." (*Mendoza*, *supra*, 18 Cal.4th at p. 1133.) The natural and probable consequences doctrine applies equally to aiders and abettors and conspirators. (*People v. Prettyman* (1996) 14 Cal.4th 248, 260-261 .)

Defendant contends on appeal for the first time that the instructions should have incorporated a reasonable person standard in order to guide the jurors in determining what constitutes natural and probable consequences. As a preliminary matter, "[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024.) Because defendant did not object at trial that the instructions were incomplete as given, the issue is forfeited. It is also without merit, as we explain.

Defendant argues that the italicized portions of the instructions quoted in the preceding section did not adequately convey the jury's role in applying the natural and probable consequences doctrine because they failed to include language similar to that which appears in paragraph 3 of CALCRIM No. 403 (added Jan. 2006, rev. Feb. 2015): "Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the _____ <insert non-target offense> was a natural and probable consequence of the commission of the _____ <insert target offense>." The Authority following CALCRIM No. 403 includes a citation to *People v. Nguyen* (1993) 21 Cal.App.4th 518, 531 (*Nguyen*) for the natural and probable consequences doctrine and reasonable person standard. (Authority to CALCRIM No. 403 (2015 rev.) p. 167.) In *Nguyen*, the Court of Appeal explained that the question whether a particular crime was a natural and probable consequence of another crime aided

77

and abetted by a defendant "does not turn on the defendant's subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*Nguyen*, *supra*, 21 Cal.App.4th at p. 531.)

The fact that the current CALCRIM instruction includes additional clarifying language to better assist jurors in applying the natural and probable consequences doctrine does not mean that the absence of such language in the version of CALJIC given at defendant's 1998 trial makes the instruction incorrect. (See *People v. Morales*, *supra*, 25 Cal.4th at p. 48, fn. 7 [jury instructions are not the law].) Further, this court has concluded in *Coffman and Marlow*, *supra*, 34 Cal.4th at page 107, that the term "natural and probable consequences" is not a special legal term that requires additional definition, and that "natural and probable" and "reasonably foreseeable" are equivalent concepts. Accordingly, the claim fails on the merits.[26]

---

[26] While defendant's appeal was pending, this court held in *People v. Chiu* (2014) 59 Cal.4th 155, 167 (*Chiu*), that as a matter of law, an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. The decision in *Chiu* thus governs this case. (See *People v. Rollins* (1967) 65 Cal.2d 681, 685, fn. 3 ["As a matter of normal judicial operation, even a non-retroactive decision ordinarily governs all cases still pending on direct review when the decision is rendered."].)

As stated, the jury here was instructed on aider and abettor liability for murder under CALJIC No. 3.02, as set forth above. This instruction, when considered together with other instructions given to the jury (e.g., CALJIC Nos. 8.10 , 8.11, and 8.20) permitted the jury to convict defendant of premeditated first degree murder as an aider and abettor under the natural and probable consequences doctrine. This was error under *Chiu*. Reversal is not required on this ground, however, because we conclude beyond a reasonable doubt that the record reveals the jury based its verdicts on a legally valid theory. (*Chiu*, *supra*, 59 Cal.4th at p. 167, citing *Chun*, *supra*, 45 Cal.4th at pp. 1203-1205.) As we

*10.  CALJIC No. 2.02*

The trial court instructed the jury under a modified version of CALJIC No. 2.02, the pattern instruction regarding the sufficiency of evidence to prove specific intent or mental state, as follows:  "The specific intent with which an act is done may be shown by the circumstances surrounding the commission of the act. However, you may not find the defendant guilty of the crimes charged in Counts 4, 6, 7, 8, 9 and 10 unless the proved circumstances are not only, one, consistent with the theory that the defendant had the required specific intent, but two, cannot be reconciled with any other rational conclusion.  [¶]  Also, if the evidence as to any specific intent permits two reasonable interpretations, one of which points to the existence of the specific intent, and the other to its absence, you must adopt that interpretation which points to its absence.  If on the other hand one interpretation of the evidence as to the specific intent appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."  As given, the modified version of the instruction omitted from the original form of CALJIC No. 2.02 the phrase "[or] [ and ] [mental state]" after each instance of the phrase "specific intent."

---

explained in *Chun*, one appropriate method of assessing the prejudicial effect of this type of error is to determine whether "other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary" to support a valid theory of liability. (*Chun*, *supra*, at p. 1205.)  The record in this case indicates that the jury was properly instructed on valid theories of first degree felony murder (§ 189), with underlying offenses of robbery and burglary.  The jury's guilty verdicts concerning robbery of each murder victim (counts 6-8), and burglary (count 9), and its true findings for each of the murder victims regarding robbery-murder and burglary-murder special circumstances leave no doubt that the jury made the findings necessary to support valid guilty verdicts on the murder charges, and therefore we conclude the instructional error under *Chiu* was harmless beyond a reasonable doubt.

79

On appeal, defendant contends that the trial court erred by so omitting the phrase in the instruction and in limiting the applicability of the instruction to the attempted murder, robbery, burglary, and conspiracy counts (counts 4 and 6-10). As a result, defendant asserts the jurors reasonably understood that the principles of CALJIC No. 2.02 did not apply to determining the mental state issues regarding aiding and abetting, that is, any mental state issues not explicitly identified as a "specific intent." We disagree.

In *People v. Bloyd* (1987) 43 Cal.3d 333, the defendant advanced a similar complaint. "The court explained direct and circumstantial evidence (CALJIC No. 2.00) and it gave the general sufficiency of circumstantial evidence instruction (CALJIC No. 2.01) which is required to be given by the court on its own motion where the case rests substantially or entirely on circumstantial evidence, as it does here. [Citations.] In an abundance of caution, in the prosecutor's view, or as required, in the defendant's view, the court also instructed as to circumstantial evidence to prove specific intent. Its instruction was based on CALJIC No. 2.02, but in its reading, the trial court deleted the phrase '(or) (mental state).' " (*Id.* at p. 351, fns. omitted.) We concluded that the defendant suffered no prejudice from the omission of the phrase, in large part because the specific question that would have been posed by adding the phrase " 'or mental state' " was covered by the general circumstantial evidence instruction that was given. (*Id*. at p. 352.)

This case is similar to *Bloyd.* The circumstantial evidence offered in this case was not limited to proving only defendant's specific intent, but also, for example, to show that defendant loaded and used a .38-caliber handgun. Therefore, the more inclusive CALJIC No. 2.01 was properly given.[27] In turn, the

27 CALJIC No. 2.01, as given, informed the jury as follows: "[A] finding of guilt as to any crime may not be based on circumstantial evidence unless the

80

jurors would reasonably have applied that latter instruction to resolve the specific question that would have been posed had the "(or) (mental state)" language been included under CALJIC No. 2.02.

Defendant suggests that giving CALJIC No. 2.01 did not cure the alleged defect because CALJIC No. 2.02 was more specific than CALJIC No. 2.01 and presumably, the jurors would have relied on CALJIC 2.02 as governing their consideration of specific intent and mental state issues. The logic is faulty. As given, CALJIC No. 2.02 applied to only the "specific intent" elements of counts 4 and 6 through 10. Therefore, the jurors reasonably would have relied on CALJIC No. 2.01 to resolve any questions involving other mental states with regard to the remaining charges and the consideration of circumstantial evidence in general. Further, CALJIC No. 2.02 did not suggest that the jury was precluded from applying the general rule of CALJIC No. 2.01 to all other issues. For these reasons, we conclude there is no reasonable likelihood the jury would have understood the instruction in the manner defendant contends. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 (*Estelle*).) The claim fails on the merits.

---

proved circumstances are not only, one, consistent with the theory that the defendant is guilty of the crime, but, two, cannot be reconciled with any other rational conclusion. [¶] Furthermore, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which the inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence as to any particular count permits two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence and reject that interpretation that points to his guilt. [¶] If on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

*11. Jury Instructions on Accomplice Liability*

The trial court instructed the jury under then-existing CALJIC No. 3.00, as follows: "Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation, is equally guilty. Principals include: [¶] One, those who directly and actively commit or attempt to commit the act constituting the crime; [¶] Or two, those who aid and abet the commission or attempted commission of a crime."

Defendant contends this instruction required the jurors to find that all the participants in the murders were "equally guilty" and thus, precluded the jurors from finding defendant guilty of second degree murder without also finding that Sanchez and Nunez committed only second degree murder. To the extent defendant claims the instructions affected his substantial rights, we may review his claim under section 1259 despite his failure to raise the issue below. Nonetheless, it is without merit.

CALJIC No. 3.01, as given, defined an aider and abettor as one who, "[w]ith knowledge of the unlawful purpose of the perpetrator" and "the intent or purpose of committing or encouraging or facilitating the commission of the crime," "aids, promotes, encourages or instigates the commission of the crime."

" 'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' [Citation.]" (*Bryant, Smith, and Wheeler*, *supra*, 60 Cal.4th at p. 433.) " ' "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]" [Citation.] " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a

82

consideration of parts of an instruction or from a particular instruction.' " '
(*People v. Solomon* (2010) 49 Cal.4th 792, 822 [].)" (*Ibid.*)

To the extent defendant argues that CALJIC No. 3.00 is erroneous in all cases, he is incorrect. As we stated in *Bryant, Smith, and Wheeler*, that instruction "generally stated a correct rule of law. All principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable." (*Bryant, Smith, and Wheeler*, *supra*, 60 Cal.4th at p. 433; see also § 31 ["All persons concerned in the commission of a crime, … whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, … are principals in any crime so committed."].)[28]

This court held in *People v. McCoy* (2001) 25 Cal.4th 1111, 1122, that in the context of homicide, if an aider and abettor's "mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator." (See *id.* p. 1122, fn. 3.) Defendant argues that a jury should be permitted to find an aider and abettor less culpable than the actual perpetrator of the target crimes. We need not address the issue because any instructional error was harmless. The felony-murder and conspiracy verdicts completely eliminate the possibility that defendant could have been convicted of anything less than first degree murder.

Finally, defendant contends the instruction under the natural and probable consequences doctrine, allowing the jury to find him guilty of first degree murder,

---

[28] As we also noted in addressing a similar claim, "CALJIC No. 3.00 has been revised to address the circumstance that aiders and abettors are not always guilty of the same crime as the actual perpetrators. (See Use Note to CALJIC No. 3.00 (Spring 2010 rev.); *People v. McCoy*[, *supra*,] 25 Cal.4th 1111, 1122.)" (*Bryant, Smith, and Wheeler, supra*, 60 Cal.4th at p. 433.)

was erroneous because it did not permit a finding that the natural and probable consequence of the crime he aided and abetted was second degree murder. We need not address this question. As explained *ante*, at page 78, the instruction was erroneous because an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine (*Chiu*, *supra*, 59 Cal.4th at p. 167), but the error was harmless in this case.

### 12. *"Acquittal First" Instruction*

The trial court instructed the jury under CALJIC No. 8.75, as follows: "The court cannot accept a verdict of guilty of second degree murder as to Counts 1, 2, or 3 unless the jury also unanimously finds and returns a signed verdict form of not guilty as to murder of the first degree in the same count." Defendant contends the instruction is erroneous because it prevented the jury from fully considering the lesser included offense of second degree murder. We have repeatedly rejected the contention. (See, e.g., *People v. Whisenhunt* (2008) 44 Cal.4th 174, 222-223; *People v. Nakahara* (2003) 30 Cal.4th 705, 715; *Riel*, *supra*, 22 Cal.4th at pp. 1200-1201.) Defendant provides no persuasive basis to revisit the issue.

### 13. *Jury Instructions That Are Assertedly Argumentative or Favored the Prosecution*

Defendant contends several standard instructions that the trial court gave to the jury were argumentative and improperly favored the prosecution. Preliminarily, because defendant did not object to, or request amplification or clarification of, any of the instructions at trial, the claims are forfeited on appeal. (*People v. Livingston*, (2012) 53 Cal.4th 1145, 1165.) The claims are also without merit.

"[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." (*People v. Mills* (2012) 55 Cal.4th

663, 677.) In reviewing an ambiguous instruction, we inquire whether there is a reasonable likelihood that the jury misunderstood or misapplied the instruction in a manner that violates the Constitution. (*Estelle*, *supra*, 502 U.S. at p. 72.) "A single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by consideration of the entire instructions given to the jury." (*People v. Lucas* (2014) 60 Cal.4th 153, 287 (*Lucas*).)

As we explain, there is no reasonable likelihood that the jury misapplied the instructions as defendant suggests.

### a. CALJIC Nos. 2.51 and 2.70

Defendant contends the instructions on motive (CALJIC No. 2.51) and "confession and admission" (CALJIC No. 2.70)[29] improperly bolstered the prosecution's case because they applied only to him and undermined the defense theory that Ramirez and Sanchez committed crimes based on their own independent motives (e.g., Sanchez had a dispute with Ramon over drugs sales, and Ramirez stole the hair oil product because that was the brand he used). We disagree.

---

[29] The trial court instructed the jury under CALJIC No. 2.51 that "[m]otive is not an element of the crimes charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant's guilt. Absence of motive may tend to show the defendant's innocence." CALJIC No. 2.70, as given, provided that "[a] confession is a statement made by a defendant … in which he has acknowledged his guilt of the crimes for which he is on trial. In order to constitute a confession, the statement must acknowledge participation in the crimes as well as the required criminal intent. [¶] An admission is a statement made by a defendant which does not by itself acknowledge his guilt of the crimes for which he is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made a confession or admission, and if so, whether that statement is true in whole or in part."

Nothing in CALJIC No. 2.51 precluded the jurors from considering evidence of the motives of the coparticipants to the extent such evidence bore on defendant's guilt. If the jurors believed defendant did not share their motives, the jury was permitted to consider any absence of motive as tending to show his innocence.

Next, CALJIC No. 2.70 simply defined a confession and an admission. Defendant fails to explain how the definitions undermined his defense that the coparticipants acted on their own in committing the crimes. He also fails to demonstrate that the instruction was improper merely because it referred to his out-of-court-statement and not those of the coparticipants. "[T]he jury's duty was to decide whether *defendant's* guilt had been proved beyond a reasonable doubt. The jury did not need to ascertain [Ramirez's, Sanchez's, and Nunez]'s guilt in the … homicides, but needed only to ascertain whether evidence of [their] involvement in the homicides generated reasonable doubt as to defendant's guilt … ." (*Lucas*, *supra*, 60 Cal.4th at p. 286, italics added.)

In addition, we have held that omission of instructions that "properly pinpoint the theory of third party liability … is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*People v. Hartsch* (2010) 49 Cal.4th 472, 504 (*Hartsch*).) The jurors were instructed that they could consider any witness's prior consistent or inconsistent statements (CALJIC Nos. 2.13, 2.20) and the existence or nonexistence of motive in evaluating each witness's credibility (CALJIC No. 2.20). Also, the trial court instructed the jury on how to consider a coconspirator's out-of-court statement against defendant. (CALJIC No. 6.24.)

In sum, defendant has not established a reasonable likelihood that the jury could have misapplied CALJIC No. 2.70 in an unconstitutional manner. (*Estelle*, *supra*, 502 U.S. at p. 72.)

### b.  CALJIC Nos. 2.03 and 2.52

Defendant contends the trial court erred in giving CALJIC Nos. 2.03 and 2.52,[30] standard instructions that addressed the jury's consideration of evidence regarding a defendant's consciousness of guilt.  He asserts the instructions were argumentative and unfairly failed to inform the jury that it could consider consciousness of guilt evidence concerning coparticipants Sanchez, Nunez, and Ramirez, including evidence that each fled the scene immediately after the shootings and that Ramirez admitted he made false statements to police.  We disagree.

Preliminarily, we have explained that these instructions benefit the defense. "[E]ach . . . instruction[] made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior.  The cautionary nature of the instructions benefits the defense,

---

[30]     The trial court instructed under CALJIC No. 2.03  that "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a conscientiousness of guilt.  However, that conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are for you to decide."  The court also instructed under CALJIC No. 2.52:  "The flight of a person immediately after the commission of a crime or after he or she is accused of a crime is not sufficient in and of itself to establish guilt, but is a fact, which if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

87

admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.)

Defendant does not explain how CALJIC Nos. 2.03 and 2.52 hindered his defense merely because the instructions were inapplicable to statements made by the coparticipants. As stated above, the jury in this case was tasked with determining whether the prosecution had proved *defendant's* guilt beyond a reasonable doubt. Although the jury needed to ascertain whether evidence of the involvement of Sanchez, Ramirez, and Nunez in the crimes created a reasonable doubt as to defendant's guilt, it did not need to resolve the issue of their guilt. (*Lucas*, *supra*, 60 Cal.4th at p. 286.) Still, nothing in either instruction prohibited the jurors from considering evidence that each participant fled the scene immediately after the shootings and that Ramirez admitted he made false statements to police. With respect to the latter, the jurors were instructed that they could consider Ramirez's admission of untruthfulness in evaluating his credibility. For these reasons, there is no reasonable likelihood that the jury misapplied the instructions in a way that violated defendant's constitutional rights. (*Estelle*, *supra*, 502 U.S. at p. 72; see *Hartsch*, *supra*, 49 Cal.4th at p. 501 [concluding the trial court properly rejected proposed instruction that would have told the jury that false or misleading testimony about the charged offenses from *any* witness could be considered to prove that witness's guilt, because such an instruction could "lead to absurd results"].)

*c. CALJIC Nos. 2.21.1, 2.21.2, and 2.27*

Defendant contends CALJIC Nos. 2.21.1, 2.21.2, and 2.27,[31] standard

instructions on the credibility of witness testimony, were constitutionally deficient

because they failed to inform the jury that the same principles apply to evaluating

the credibility of out-of-court statements of individuals who did not testify. We

have rejected these arguments, and defendant provides no persuasive reason to

reconsider our prior decision. (*Lucas*, *supra*, 60 Cal.4th at p. 293.)

*d. CALJIC No. 2.13*

Defendant claims CALJIC No. 2.13,[32] which addresses the consideration of

prior consistent and inconsistent statements, "unfairly skewed" the jury's

---

[31] CALJIC No. 2.21.1, as given, provided: "Discrepancies in a witness's testimony or between one witness's testimony and that of other witnesses, if there were any, do not necessarily mean that any witness should be discredited. Failure of recollection is common. Innocent misrecollection is not uncommon. Two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to an important matter or only to something trivial should be considered by you."

CALJIC No. 2.21.2, as given, provided: "A witness who was willfully false in one material part of his or her testimony is to be distrusted in others. You may reject the entire testimony of a witness who willfully has testified falsely as to a material point, unless from all the evidence you believe the probability of truth favors his or her testimony in other particulars."

CALJIC No. 2.27, as given, provided: "You should give the uncorroborated testimony of a single witness whatever weight you think it deserves. Testimony by one witness which you believe concerning any fact whose testimony about that fact does not require corroboration is sufficient for the proof of that fact. You should carefully review all of the evidence upon which the proof of that fact depends."

[32] CALJIC No. 2.13, as given, provided: "Evidence that at some other time a witness made a statement or statements that is or are consistent or inconsistent with testimony given before — with his or her testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion."

89

credibility determination in favor of prosecution witnesses because it instructed that the jurors may consider a prior consistent or inconsistent statement as evidence of the truth of the prior statement, but not its falsity. We have previously rejected a similar claim, and we do so again here. (*Bryant, Smith, and Wheeler*, *supra*, 60 Cal.4th at p. 438; *People v. Friend* (2009) 47 Cal.4th 1, 41-42.)

### e. Cumulative Instructional Error

Finally, defendant claims the cumulative effect of the asserted instructional errors described in this claim requires reversal of his conviction. Because defendant has failed to demonstrate any error, there is no prejudicial cumulative effect.

### 14. Adequacy of the Burden of Proof Instruction

Defendant claims on numerous grounds that the standard instruction on burden of proof beyond a reasonable doubt (CALJIC No. 2.90) fails to adequately explain the burden of proof.[33] Defendant complains specifically that the instruction fails to (1) explain that a defendant has no obligation to present or refute evidence; (2) inform the jury that a defendant's presentation of evidence does not shift the burden of proof; (3) explain that a conflict in the evidence or a lack of evidence could leave jurors with reasonable doubt; (4) explain that the presumption of innocence continues throughout the entire trial; (5) state that a

---

[33] CALJIC No. 2.90, as given, provided: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt because every relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

defendant is presumed innocent "unless," instead of "until," the contrary is proved; and (6) define the term "burden."

Preliminarily, defendant did not object to or request amplification of CALJIC No. 2.90 as given. Therefore, with the exception of the first two claims of error, defendant forfeited these issues on appeal. (*Lucas*, *supra*, 60 Cal.4th at p. 295.) In any event, we have rejected similar claims. (*Id*. at pp. 294-296.) Defendant offers no persuasive ground to revisit the issues.

Next, defendant contends CALJIC No. 2.90 is inadequate because it fails to inform jurors that "every element" of the charges must be proved beyond a reasonable doubt. Again, defendant's failure to seek amplification or further clarification of the standard instruction forfeits this issue on appeal. (*Lucas*, *supra*, 60 Cal.4th at p. 295.) In any event, we have previously rejected a similar claim. (E.g., *People v. Thomas* (2011) 52 Cal.4th 336, 356.) Defendant offers no persuasive reason warranting reconsideration of our prior decisions.

*15. Additional Challenges to the Burden of Proof Instruction*

Defendant complains that the standard instruction on burden of proof, CALJIC No. 2.90 was erroneous on several additional grounds. He specifically claims that (1) the terms "abiding conviction" requires definition and any definition should distinguish "abiding conviction" from the lesser standard of clear and convincing evidence; (2) by requiring more than "mere possible or imaginary doubt" the standard instruction implies that jurors must articulate reasons for their doubt; (3) the instruction incorrectly stated that "possible" doubt could not constitute "reasonable" doubt; (4) CALJIC Nos. 2.01 and 2.02 impermissibly lightened the prosecution's burden of proof and created a mandatory conclusive presumption of guilt upon a preliminary finding that evidence of guilt merely "appears reasonable"; and (5) the standard circumstantial evidence instructions,

CALJIC Nos. 2.01 and 2.02, should have been supplemented with an instruction informing the jury that "if direct evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt."

Preliminarily, because defendant failed to seek modification or further clarification of the standard instruction on these grounds, the issues are forfeited on appeal. (*Lucas*, *supra*, 60 Cal.4th at p. 295.) In any event, we have previously rejected the claims and do so again. (*Id*. at pp. 296-299.) Accordingly, the contentions are without merit.

### 16. *Challenges to Other Instructions that Assertedly Diluted the Reasonable Doubt Standard*

Defendant contends that several jury instructions unconstitutionally diluted the prosecution's burden of proof. The claims are not cognizable, however, because defendant was obligated to seek amplification or clarification of the instructions and failed to do so. (See *Lucas*, *supra*, 60 Cal.4th at p. 295.) In addition, each claim is without merit.

First, defendant complains that CALJIC No. 2.27, the instruction that concerns the sufficiency of testimony of one witness, erroneously suggested that both the prosecution and defense had the burden of proving facts. The instruction as given stated as follows: "You should give the uncorroborated testimony of a single witness whatever weight you think it deserves. Testimony by one witness which you believe concerning any fact whose testimony about that fact does not require corroboration is sufficient for the proof of that fact. You should carefully review all of the evidence upon which the proof of that fact depends." (*Ibid.*)

We have previously rejected the claim. (*People v. Carey* (2007) 41 Cal.4th 109, 131.) Defendant offers no persuasive reason to reconsider our prior decision.

92

Next, defendant contends that instructing the jury under CALJIC No. 2.27 violated his right to due process because the "which you believe" language allowed for proof based on mere "belief" that a single witness was telling the truth, rather than the constitutionally required proof beyond a reasonable doubt. The claim does not survive analysis. The jury is informed that evidence comes in a myriad of forms, including witness testimony, and that each juror is to determine the believability of a witness's testimony. (CALJIC Nos. 2.00, 2.20.) Defendant does not explain how believing a witness's testimony about a fact would or could be different from finding that fact proved beyond a reasonable doubt. Indeed, considering the instructions as a whole, there is no reasonable likelihood that the jury understood CALJIC No. 2.27 to operate in the convoluted manner defendant suggests. (See *Estelle*, *supra*, 502 U.S. at p. 72.) Therefore, the claim fails on the merits.

Defendant additionally contends that CALJIC No. 2.51, which informed the jurors that motive is not an element of an offense,[34] conflicted with the standard instruction on felony murder, CALJIC No. 8.21, by improperly suggesting to the jurors that they need not find that defendant intended to commit robbery in order to convict him of first degree murder. We disagree. The court instructed the jury that a finding of felony-murder required proof beyond a reasonable doubt that the defendant had the specific intent to commit burglary or robbery. Nothing in CALJIC No. 2.51 conflicted with that instruction. In addition, "[m]otive describes the reason a person chooses to commit a crime. The reason, however, is different

---

[34] The jurors were instructed under CALJIC No. 2.51, as follows: "Motive is not an element of the crimes charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant's guilt. Absence of motive may tend to show the defendant's innocence."

93

than a required mental state such as intent or malice." (*People v. Hillhouse, supra*, 27 Cal.4th at p. 504.) The instructions consistently referred to the requisite "intents" for all the charged crimes. There is no reasonable likelihood that the jury construed the motive instruction as defendant suggests. (*Estelle*, *supra*, 502 U.S. at p. 72; *Hillhouse*, *supra*, 27 Cal.4th 504.) The claim therefore is without merit.

Finally, defendant claims that CALJIC No. 8.20, which states in part that premeditation and deliberation "must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation," could be interpreted to require defendant to disprove the possibility of premeditation, thereby shifting the burden of proof. We have previously rejected the claim. (*Hartsch*, *supra*, 49 Cal.4th at p. 506.) Defendant provides no persuasive reason to reconsider our prior decision.

*17. Equal Protection Challenge to the Reasonable Doubt Instruction*

Defendant perfunctorily contends that CALJIC No. 2.90 denied him equal protection of law because it fails to provide an "adequate and uniform standard for determining the level of certainty to which the jury must be persuaded in order to assess whether the People have carried their burden of proof." He asserts that "each and every jury and each and every juror sitting in California (including [the jurors] in [his] case) were and are free to apply a different standard in assessing the critical reasonable doubt issue in violation of the 14th Amendment of the federal [C]onstitution."

Defense counsel's failure to seek amplification or further clarification of the standard instruction forfeited the issue on appeal. (*Lucas*, *supra*, 60 Cal.4th at p. 295.)

*18. Request to Record the Testimony of the Spanish-speaking
Witnesses*

Defendant contends that the trial court erred in denying his request to have his entire trial audio-recorded on the ground that there exists a "possibility" that the Spanish translator may not have accurately translated the testimony of Spanish-speaking witnesses.  As a result, defendant asserts that he was deprived of a complete and accurate record of the trial proceedings, in violation of his federal constitutional rights to due process, assistance of counsel, and meaningful appellate review under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and the corollary state constitutional rights (Cal. Const., art. I, §§ 7, 15, 17).  The claim lacks merit.

" ' "[S]tate law entitles a defendant only to an appellate record 'adequate to permit [him or her] to argue' the points raised in the appeal.  [Citation.]  Federal constitutional requirements are similar.  The due process and equal protection clauses of the Fourteenth Amendment require the state to furnish an indigent defendant with a record sufficient to permit adequate and effective appellate review.  [Citations.]  Similarly, the Eighth Amendment requires reversal only where the record is so deficient as to create a substantial risk the death penalty is being imposed in an arbitrary and capricious manner.  [Citation.]  The defendant has the burden of showing the record is inadequate to permit meaningful appellate review." ' " (*Letner and Tobin, supra*, 50 Cal.4th at p. 195.)

Defendant complains that because there is no memorialized record of the original testimony of the Spanish-speaking witnesses, he is unable to verify the accuracy and reliability of the interpreted testimony that appears in the record.  He asserts there are numerous examples in the record in which the English translation of a Spanish-speaking witness does not convey "a clear and understandable thought."  As an example, defendant points to the following colloquy that occurred

95

during the prosecutor's direct examination of Ramirez: "Q. [THE PROSECUTOR] Was there — when you shot that 30/30 rifle, was there anything that was ejected from the gun, from the side of the gun? [¶] A. [RAMIREZ] Yes. [¶] Q. [THE PROSECUTOR] What? [¶] A. [RAMIREZ] The casket." Defendant speculates that any lack of clarity in the testimony reflects error in the Spanish to English translation of the witness's testimony. Speculation, however, is insufficient to demonstrate that the record is inadequate to permit effective appellate review. (*People v. Young* (2005) 34 Cal.4th 1149, 1170.) For example, witness testimony such as the example mentioned above may be caused by the witness's own word choice and not any translation error.[35] Defendant does not maintain that there is any unclear or unintelligible testimony of a Spanish-speaking witness that can be attributed to translation error and that also is relevant to an issue he raises on appeal.

Because defendant has not demonstrated that the denial of his request to audio record the testimony of Spanish-speaking witnesses has " ' "prevented adequate and effective appellate review or created a substantial risk the judgment was arbitrary and capricious," ' " his claim fails. (*Letner and Tobin, supra*, 50 Cal.4th at p. 195.)

### 19. Instruction on Defendant's Videotaped Statement

As stated, the prosecution played for the jury a videotaped statement by defendant in which he denied any intent to steal from the victims but admitted, among other things, "the crime took place out of fear" and "we shot like crazy." Defendant spoke in Spanish, and the prosecutor provided a certified translation for

---

[35] Immediately following the exchange, the prosecutor asked Ramirez, "Casing?" Ramirez answered, "Casing."

the jury.  The parties stipulated that the videotaped statement was translated accurately into a written document by a certified interpreter.

Prior to the playing of the videotape, the court instructed the jury:  "We're going to play a videotape.  And you have in your hands a translation of that tape.  Some of you — again, some of you may have some proficiency in Spanish.  Others of you may have no proficiency in Spanish.  You should rely on the transcription, and you should not — none of you, if you happen to have some proficiency in Spanish, should anoint yourselves as any kind of an expert so as to provide aid independently of the evidence to other jurors as to what is or is not being said on the tape.  That comports with the general rule that the jury is to rely upon the evidence that is presented in court and not upon evidence from outside sources.  So please keep that in mind if there are some of you who do have some proficiency in Spanish."

Defendant contends that the court erred because "although the judge's instruction admonished Spanish speaking jurors not to talk 'to other jurors' about their own translation of the recording, the admonition did not preclude Spanish speakers from themselves considering their own translations of the Spanish in the recording."  At this stage, the relevant inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violated the Constitution.  (*Estelle*, *supra* 502 U.S. at p. 72; *People v. Avila* (2014) 59 Cal.4th 496, 508.)  In addition, " ' "we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1321.)

Preliminarily, if defendant did not believe the instruction given was adequate to cover this subject, then he was required to seek modification or clarification of the instruction in the trial court.  (See *Lucas*, *supra*, 60 Cal.4th at

97

p. 295.)  Defendant's failure to do so forfeited the claim on appeal.  In any event, the claim falls on the merits.

Defendant fails to demonstrate a reasonable likelihood that the jury misinterpreted the instruction in a way potentially unfavorable to the defense.  The trial court admonished the jurors that they were to "rely on the transcription" it provided them.  The court also told the jurors not to share their own translations of what was said on the videotape with other jurors.  Therefore, the essence of the instruction was that the English translation that appeared in the transcription constituted the evidence.  It is difficult to perceive how a reasonable juror could construe this admonition to permit any juror to rely on any translation other than the one provided by the trial court.

Moreover, before commencement of the guilt phase deliberations, the court reminded the jurors that "you must decide all questions of fact from the evidence received in this trial and *not from any other source*."  It then instructed the jury that "[w]hen a witness has testified through a certified court interpreter, you must accept the English interpretation of that testimony even if you would have translated the foreign language differently."  For these reasons, we conclude there is no reasonable likelihood that the jury would have understood the instruction in the manner defendant now contends.

### 20.  Readback of Testimony During Deliberations

For the first time on appeal, defendant claims the trial court erred in allowing the court reporter to read requested portions of the trial transcripts to the jurors in the jury room during the guilt trial deliberations.  Defendant argues that the asserted error violated his state and federal constitutional rights to a public trial, to be personally present, to counsel, and to the presence of a trial judge.  The claims are without merit.

98

### a. Factual and procedural background

During guilt phase deliberations, the jury requested readback of the testimony of prosecution witnesses Ramirez, Bertha, and Trejo. In proceedings held in open court and in the presence of the jury, the trial court confirmed with the jury foreperson the testimony to be covered. The foreperson also requested readback of the testimony of the sales clerk at the ammunition store. The trial court responded: "All right. Okay. Then we'll have somebody come in and read after you go back and start deliberating. The attorneys and I will satisfy ourselves that we have located the testimony that you are interested in. And we'll provide that for you probably in the form of having the reporter join you in the jury room and read that testimony to you. [¶] Now, please keep in mind, when the reporter comes in to read, that's all she is there to do is just to read. She cannot respond to questions."

After the jury was excused, counsel informed the trial court that there were two sales clerks from the ammunition store who testified, and the prosecutor agreed. The court stated it would provide readback of the testimony of both clerks. The following colloquy occurred: "THE COURT: Is it agreeable then between counsel that we proceed in that manner? [¶] And would you like to review the areas of testimony that the reporter finds as bearing on the questions that the jury has asked? [¶] [THE PROSECUTOR]: I would like to only because we may be able to help the reporter as well to locate that. [¶] THE COURT: All right. So you, [TRIAL COUNSEL], I understand you have a prelim to go to? [¶] [TRIAL COUNSEL]: Oh, no. I can — apparently, that may not be the situation. [¶] THE COURT: All right. [¶] [TRIAL COUNSEL]: I can assist in that as well. [¶] THE COURT: Good. Then that will be the plan as to how the reporter gets to the information she needs. Okay. Court's in recess."

*b. Discussion*

*(i) Right to a public trial*

Defendant contends that the court violated his right to a public trial by conducting the readback in the jury room and not in open court. The contention lacks merit.

" 'Every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial which is open to the general public at all times.' (*People v. Woodward* (1992) 4 Cal.4th 376, 382.) However, the scope of that right is not absolute. 'The right to public trial may be waived [citation], the waiver may be implied from failure to object [citations], and the waiver may be made by defense counsel on defendant's behalf.' " (*Lucas*, *supra*, 60 Cal.4th at p. 301 quoting *People v. Lang* (1989) 49 Cal.3d 991, 1028.)

Here, counsel did not object to the court's proposed procedures for readback of the testimony and remained silent when the court asked if the parties agreed to the procedures. In addition, when the court discussed the procedures with the parties, counsel understood that the readback of testimony would be conducted in the jury deliberation room and not in open court. Under these circumstances, "[a]ssuming the right to public trial extends to the reading of testimony during jury deliberations," counsel effectively waived defendant's right. (*People v. Lang, supra,* 49 Cal.3d at p. 1028.)

*(ii) Right to personal presence*

Defendant contends that because he did not waive his right to be present at trial, he was entitled to be present at the readback of testimony because a readback of testimony "is not less important than the original taking of the testimony." Assuming the claim is not forfeited, it is one we previously have rejected. (See *Lucas*, *supra*, 60 Cal.4th at p. 299 ["regardless of whether defendant waived his

100

right to be present, the rereading of testimony is not considered a critical stage of trial in which the defendant has a constitutional right to personal presence"].)

In any event, "[a]bsent a showing of prejudice, a defendant's 'absence from a rereading of testimony does not raise due process concerns.' " (*Lucas*, *supra*, 60 Cal.4th at p. 300.) Nothing in the record suggests that defendant's personal presence would have assisted the defense in any manner. Defendant's suggestion that the reporter may have given undue emphasis to certain portions of the transcript (e.g., by emphasis of voice) or read from the wrong transcript, or that a portion of the testimony may have been inadvertently omitted is entirely speculative.

### (iii)  Right to presence of counsel

Defendant contends that his state and federal constitutional right to counsel was violated when the readback of testimony was conducted in counsel's absence. Defendant's claim is forfeited because he did not object to the plan proposed by the trial court in accommodating the jury's request for testimony. (*Lucas*, *supra*, 60 Cal.4th at p. 300.) In any event, we previously have rejected the claim. (*Ibid*.)

### (iv)  Right to personal presence of the trial judge

Defendant contends the readback procedures used in this case, described above, violated his statutory rights under section 1138 and his Sixth Amendment right to an impartial jury, because the trial judge did not supervise the reading back of testimony. Once again, defendant forfeited the issue by counsel's failure to object to the procedures that were employed to provide the jury with the requested readback of testimony. (See *People v. Roldan* (2005) 35 Cal.4th 646, 728-729 (*Roldan*) [by failing to object, defendant forfeited claim that the trial court erred under section 1138 and violated his constitutional rights by acceding to the jury request to read the four questions asked of each jury during jury selection

101

without inquiring about the jury's reason for the request].)  In any event, we previously have rejected the claim.  (*Lucas*, *supra*, 60 Cal.4th at pp. 300-301.)

### 21.  Reference to the Prosecution as "the People"

Defendant contends the trial court's reference to the prosecution in his case as "the People" was fundamentally unfair and violated his state and federal constitutional rights to due process and a fair trial.  As he acknowledges, we have previously rejected this claim.  (*Lucas*, *supra*, 60 Cal.4th at p. 289; *People v. Thomas* (2012) 53 Cal.4th 771, 816; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1068.)  We do so again.

### 22.  Instruction on the Murder Counts

Defendant contends that the trial court erred by limiting the instruction on concurrence of act and specific intent, CALJIC No. 3.31, to the nonmurder counts and by failing to instruct the jury under CALJIC No. 3.31.5 on the concurrence of act and mental state concerning the murder counts.  Defendant did not raise this issue at trial.  Even assuming his failure to object did not forfeit the issue (§ 1259), the claim lacks merit.

The trial court instructed the jury under CALJIC No. 3.31, as follows:  "In the crimes and allegations charged in Counts 4, 6, 7, 8, 9, and 10, namely, attempted murder, robbery, three counts, burglary and conspiracy, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator.  Unless this specific intent exists, the crime to which it relates is not committed.  [¶]  The specific intent required is included in the definitions of the crimes set forth elsewhere in these instructions."  The trial court did not

instruct the jury regarding the required concurrence of act and mental state under CALJIC No. 3.31.5.**36**

We apply the independent standard of review to claims of this nature. (*People v. Alvarez* (1996) 14 Cal.4th 155, 220.) Doing so, we conclude any instructional error was harmless. Other instructions adequately conveyed the requirement, and there is no reasonable probability that a more explicit instruction would have affected the outcome of the trial. (See *People v. Rogers* (2006) 39 Cal.4th 826, 875 [applying *Watson* "reasonable probability" standard to error in failing to instruct on the concurrence requirement for implied malice murder].)

The trial court informed the jury that it could find defendant guilty of first degree murder on Counts 1 through 3 under four theories: (1) premeditated and deliberate murder; (2) felony murder; (3) conspiracy murder; and (4) aiding and abetting liability under the natural and probable consequences doctrine.**37** It then instructed the jury on each of these theories.

Pursuant to the instructions defining murder and malice aforethought, CALJIC Nos. 8.10 and 8.11, the trial court informed the jury that "[e]very person

---

**36** CALJIC No. 3.31.5 (6th ed 1996) provides as follows: "In the crime[s] charged in Count[s] _____, _____, and _____ [or which [is a] [are] lesser crime[s] thereto], [namely, _____, _____ and _____,] there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator. Unless this mental state exists the crime to which it relates is not committed. [¶] [The mental state[s] required [is] [are] included in the definition[s] of the crime[s] set forth elsewhere in these instructions.]"

**37** As discussed *ante*, page 77, as a matter of law, defendant could not have been properly convicted of premeditated and deliberate murder based on aider and abettor liability under the natural and probable consequences doctrine. (*Chiu*, *supra*, 59 Cal.4th at p. 167.) As we explained, however, the error in instructing the jury on that theory was harmless. We need not consider whether the instructions adequately conveyed the requirement of concurrence of act and intent with regard to that erroneous theory of liability.

who unlawfully kills a human being with malice aforethought . . . is guilty of the crime of murder in violation of Section 187 of the Penal Code. [¶] . . . [I]n order to prove this crime, each of the following elements must be proved: [¶] One, that a human being was killed. [¶] Two, that the killing was unlawful. [¶] And three, that the killing was done *with malice aforethought . . . .* [¶] Malice may be either express or implied. [¶] Malice is express when there is manifested an intention unlawfully to kill a human being. [¶] . . . [¶] Malice is implied when: [¶] One, the killing resulted from an intentional act. [¶] Two, the natural consequence[s] of the act are dangerous to human life. [¶] And three, *the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life*." In addition, under CALJIC No. 8.20, the jury was informed that "[i]f you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." The same instruction further informed the jury that "to constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice *and having in mind the consequences he decides to and does kill.*" (Italics added.)

Under the felony-murder instruction (CALJIC No. 8.21), the jury was informed, in relevant part, that "[t]he unlawful killing of a human being whether intentional, unintentional, or accidental, *which occurs during the commission or attempted commission of the crime of burglary or robbery* is murder of the first degree *when the perpetrator had the specific intent to commit either of those crimes*." The instruction on felony murder for an aider and abettor (CALJIC No. 8.27) told the jury that "[i]f a human being is killed by any one of several

104

persons *engaged in the commission or attempted commission of the crime of burglary or robbery*, all persons *who either directly and actively commit the act constituting those crimes or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission*, are guilty of murder in the first degree whether the killing is intentional, unintentional, or accidental." (Italics added.)

Finally, the jury was told, pursuant to CALJIC No. 8.26, in relevant part, that "[i]f a number of persons conspire together to commit burglary or robbery, and *if the life of another person is taken by one or more of them in furtherance of the common design*, and *if the killing is done to further that common purpose or is an ordinary and probable result of the pursuit of that purpose*, all of the co-conspirators are equally guilty of murder of the first degree whether the killing is intentional, unintentional, or accidental." (Italics added.)

We are satisfied that the italicized language in the above instructions, when considered in light of the trial court's instruction under CALJIC No. 3.31 (*ante*, at p. 101) on the necessity of concurrence of act and specific intent on the robbery, burglary, and conspiracy charges, "substantially covered" the concurrence requirement. (*People v. Alvarez*, *supra*, 14 Cal.4th at p. 220.) Further, we disagree with defendant that CALJIC No. 3.31 effectively told the jurors that there was no need to find concurrence as to the murder counts. As given, CALJIC No. 3.31 did not reference the crimes and allegations charged in the murder counts (counts 1-3) and given the jury received more specific instruction that referred to those counts, we presume that the jury did not draw any conclusion about the murder counts from that instruction. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1212; *People v. Thornton* (2007) 41 Cal. 4th 391, 440.) For these reasons, we

105

conclude there is no reasonable probability the error in failing to separately instruct the jury on the concurrence of act and specific intent or mental state on the first degree murder charges affected the outcome. Certainly, counsel does not articulate how a more favorable result would have been reasonably possible had the court instructed otherwise. Accordingly, the claim fails on the merits.

### 23. Whether the Trial Court Was Required to Define "Material"

The court instructed the jury under CALJIC No. 2.21.2 as follows: "A witness who was willfully false in one material part of his or her testimony is to be distrusted in others. You may reject the entire testimony of a witness who willfully has testified falsely as to a material point, unless from all the evidence you believe the probability of truth favors his or her testimony in other particulars."

Defendant contends the trial court was required to define the term "material," but he is mistaken. "[C]ommonly used words that have no technical meaning peculiar to the law impose no obligation on the court to provide definition in the absence of a request. [Citation.] Because the word 'material,' as used in CALJIC No. 2.21.2, is within its ordinary meaning of ' "substantial, essential, relevant or pertinent," ' the court did not err by failing to define it." (*Lucas*, *supra*, 60 Cal.4th at pp. 292-293.)

### 24. Consciousness of Guilt and Flight Instructions

Defendant claims that the consciousness of guilt instructions given, CALJIC Nos. 2.03 (Consciousness of Guilt — Falsehood) and CALJIC No. 2.52 (Flight After Crime),[38] were unnecessary, argumentative, circular, and invited the

---

[38] As given here, CALJIC No. 2.03 provided: "If you find before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove consciousness of guilt. However, that conduct is

106

jury to draw irrational inferences. We have rejected these claims. (*Bryant, Smith, and Wheeler*, *supra*, 60 Cal.4th at p. 438 & fn. 56; *People v. Lopez* (2013) 56 Cal.4th 1028, 1075; *People v. Bacon* (2010) 50 Cal.4th 1082, 1108; *People v. Holloway* (2004) 33 Cal.4th 96, 142 ["The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction"].) Defendant's arguments do not persuade us to reconsider our prior decisions.

### 25. CALJIC No. 3.02

The trial court instructed the jury under CALJIC No. 3.02 that pursuant to the natural and probable consequences doctrine it could find defendant guilty of murder as an aider and abettor to robbery or burglary if it found the murder was a natural and probable consequence of those target crimes. (See *People v. Gonzales* (2011) 52 Cal.4th 254, 296 ["under the 'natural and probable consequences' doctrine, an aider and abettor is guilty not only of the offense he or she intended to facilitate or encourage, but also any reasonably foreseeable offense committed by the person he or she aids and abets"].)

Defendant contends the instruction creates an improper mandatory presumption of "intent to encourage or facilitate a murder." We need not consider this claim. The jury here was also instructed on felony murder based on burglary and robbery and found true the burglary-murder and robbery-murder special-

---

not sufficient by itself to prove guilt and its weight and significance, if any, are for you to decide." CALJIC No. 2.52 provided, as follows: "The flight of a person immediately after the commission of a crime or after he or she is accused of a crime is not sufficient in and of itself to establish guilt, but is a fact, which if proved, may be considered by you in the light of all the other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

circumstance allegations as to all three murders.  We can infer from these special circumstance findings that the jury relied unanimously on a legally valid and independent theory of first degree felony murder under section 189 as to each murder victim.  (See *People v. Romero and Self* (2015) 62 Cal.4th 1, 41, citing *People v. Hovarter* (2008) 44 Cal.4th 983, 1019; see also *Chiu*, *supra*, 59 Cal.4th at p. 166 [affirming that "[a]n aider and abettor's liability for murder under the natural and probable consequences doctrine operates independently of the felony-murder rule"].)  "Under the felony-murder rule those who commit enumerated felonies are ' "strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony." ' " (*Romero and Self*, at p. 41.)  "Thus, there was no need for the jury to find . . . an 'intent to encourage or facilitate a murder.' " (*Id.* at p. 42.)[39]  Consequently, any error was harmless.  (*People v. Flood* (1998) 18 Cal.4th 470, 505 (*Flood*) ["in view of the actual verdict[s] returned by the jury . . . there is no reasonable or plausible basis for finding that the instructional error affected the jury's verdict[s]"].)

### 26. Murder Charges

The information charged defendant with malice murder under section 187 but did not charge him with first degree murder in violation of section 189, i.e., premeditated murder and murder committed in the course of committing an enumerated felony.  As a result, defendant contends the trial court lacked jurisdiction to try him for first degree murder.

---

[39] We concluded *ante*, that under *Chiu*, *supra*, 45 Cal.4th at page 167, the trial court's instructions erroneously permitted the jury to find defendant guilty as an aider and abettor for first degree premeditated murder under a natural and probable consequence theory, but further concluded the error was harmless.

We have repeatedly rejected similar claims — "whether framed in terms of a lack of jurisdiction, inadequate notice, erroneous instruction, insufficient proof, or the absence of jury unanimity." (*People v. Contreras* (2013) 58 Cal.4th 123, 147; *id.* at pp. 147-149; *People v. Taylor* (2010) 48 Cal.4th 574, 625; *People v. Friend*, *supra*, 47 Cal.4th at p. 54; *People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 222.) " '[I]f the charging document charges the offense in the language of the statute defining murder (§ 187), the offense charged includes murder in the first degree and murder in the second degree.' " (*Taylor* at p. 625.)

In addition, we have rejected defendant's argument that insofar as we have recognized a single statutory offense of first degree murder, that offense is defined by section 189. (*People v. Contreras*, *supra*, 58 Cal.4th at p. 148.) Finally, we have previously rejected defendant's argument that the information's failure to separately allege a violation of section 189 violates *Apprendi v. New Jersey* (2000) 530 U.S. 466. (*Contreras* at pp. 148-149.) "[T]his court does not violate *Apprendi* by continuing to apply the traditional California rule that a murder charge under section 187 places the defense on notice of, and allows trial and conviction on, all degrees and theories of murder, including first degree felony murder under section 189." (*Id.* at p. 149.) We decline to reconsider our precedent.

### 27. *Asserted Need for Special Instructions to Jury Foreperson*

Defendant contends that the trial court erred by failing to instruct the jury concerning the duties of the foreperson at the guilt phase deliberations. As a result, defendant suggests, the foreperson was permitted to exercise undue influence over the other jurors, thus undermining the fairness and reliability of the guilt and penalty deliberations. The claim is without merit.

109

Preliminarily, because defendant failed to request such an instruction, the claim is forfeited. In any event, the trial court instructed the jurors that "[b]oth the People and the defendant are entitled to the individual opinion of each juror," that each juror "must decide the case for yourself," and that no juror should "decide any question in any particular way because a majority of the jurors or any of them favor that decision." These instructions were sufficient to negate defendant's speculative concerns. (See *Lucas*, *supra*, 60 Cal.4th at p. 299.)

### 28. Delay in Appointing Appellate Counsel

Defendant contends that the more than five-and-one-half-year delay in appointing appellate counsel violated his constitutional rights to due process and equal protection. We have previously rejected similar claims. (*People v. Bennett* (2009) 45 Cal.4th 577, 629; *People v. Dunkle* (2005) 36 Cal.4th 861, 942; *People v. Holt*, *supra*, 15 Cal.4th at pp. 708-709.) Defendant advances no persuasive reason to reconsider our prior decisions.

### 29. General Understandability of the Instructions

Defendant contends that the CALJIC jury instructions given in his trial were confusing, difficult, and not "sufficiently understandable" by lay jurors to satisfy the Eighth Amendment requirement of heightened reliability in capital cases. In support, he asserts that because the Judicial Council established a commission that recommended the standard CALJIC jury instructions, including those given in this case, be rewritten, the commission necessarily found those instructions to be defective in conveying the necessary legal principles to the jury. We have rejected this argument. (*Lucas*, *supra*, 60 Cal.4th at p. 294.) Defendant offers no persuasive reason to reconsider that decision and otherwise fails to advance any reason why we should conclude that the jurors in his case did not understand any particular instruction. Accordingly, the claim fails on the merits.

110

### 30. *Challenges to CALJIC No. 8.80.1*

CALJIC No. 8.80.1, as given, provided:

"If you find the defendant in this case guilty of murder of the first degree as to Counts 1, 2 or 3, you must then determine if one or more of the following special circumstances is true:

"The first special circumstance is multiple murders [*sic*]. The second special circumstance is murder during the commission of burglary. The third special circumstance is murder while in the commission of robbery.

"The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

"Unless an intent to kill is an element of a special circumstance, if you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true.

"If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider or abettor or a co-conspirator, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, and counseled, commanded, induced, solicited, requested, or assisted any act during the commission of the murder in the first degree, or with reckless indifference to human life and as a major participant who aided, abetted, counseled, commanded, induced, solicited, requested or assisted in the commission of the crime of burglary or robbery which resulted in the death of a human being, namely, Ramon Morales, Martha Morales or Fernando Martinez.

"A defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being."

Defendant contends that because the jurors found that he was a coconspirator, as shown by its guilty verdict in count 10 with respect to the target crimes of burglary and robbery, they were not required by the instructions to find he intended to kill or acted with reckless indifference to human life as a major participant as is required under *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) in order to find the special circumstance allegation true. In other words, defendant asserts, the jurors would not have made the requisite findings because the instructions as given required them to do so only if they were "*unable* to decide whether the defendant was the actual killer or an aider or abettor or a coconspirator." Defendant asserts the alleged instructional error violated his rights under state law and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Even assuming that defendant did not forfeit the issue on appeal by failing to object below (§ 1259), the claim fails.

"The felony-based special circumstances do not require that the defendant intend to kill. It is sufficient if the defendant is the actual killer or either intends to kill or 'with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission' of the felony." (*People v. Rountree* (2013) 56 Cal.4th 823, 854, quoting § 190.2, subd. (d); see also *Tison, supra*, 481 U.S. at p. 158 ["major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the . . . culpability requirement" in *Enmund*]; *Enmund, supra*, 458 U.S. at p. 797 [the Eighth Amendment does not "permit[] imposition of the death penalty on one . . . who aids and abets a felony in the

112

course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed"].)

"It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.)  When a defendant claims an instruction was subject to erroneous interpretation by the jury, he must demonstrate a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted. (*Bryant, Smith, and Wheeler*, *supra*, 60 Cal.4th at p. 433.)  In determining the correctness of jury instructions, we consider the entire charge of the court, in light of the trial record.  (*Ibid.*)

Here, defendant quarrels with the following language from the fifth paragraph quoted above:  *"If you find that a defendant was not the actual killer of a human being, or if you were unable to decide whether the defendant was the actual killer or an aider or abettor or a co-conspirator,* you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, . . . or with reckless indifference to human life and as a major participant who aided, abetted, . . . or assisted in the commission of the crime of burglary or robbery which resulted in the death of . . . Ramon Morales, Martha Morales or Fernando Martinez." (Italics added.)  Defendant asserts that because the jury found he was a coconspirator**,** it would not have followed the provisions of this paragraph and made the requisite intent to kill or reckless indifference findings.  Defendant misreads the instruction.

Under the fourth paragraph above, if the jury found that defendant was an actual killer, it was not required to make additional findings.  Under the fifth paragraph, the jurors were told that if they had found that defendant was not the

113

actual killer or if they were unsure whether defendant was "the actual killer or an aider or abettor or a co-conspirator," they were required to find intent to kill or reckless indifference. The instruction would have been more complete if it had explicitly told the jury that a finding of intent to kill or reckless indifference was required if the defendant was not the actual killer and was liable for first degree murder as an aider and abettor or a coconspirator. (See *Letner and Tobin*, *supra*, 50 Cal.4th at pp. 181-182; see also CALCRIM Nos. 702, 703.) Nonetheless, the jurors would have reasonably understood that unless they found defendant was the actual killer, they were required to find intent to kill or reckless indifference.

Despite defendant's position on appeal, the fact that the jury also found that defendant was guilty of criminal conspiracy was of no consequence with regard to the issue under discussion. The jurors would have understood that the terms "actual killer," "not the actual killer," "aider and abettor," and "coconspirator" were not mutually exclusive. The jury may have believed that defendant was the actual killer and a coconspirator, in which case it learned from the instruction that it was not required to find intent to kill or reckless indifference. If the jury believed that defendant was not the actual killer and had also determined he was guilty of first degree murder as a coconspirator, it learned from the instruction that it was required to find intent to kill or reckless indifference. If the jury was unsure whether defendant was the actual killer but decided he was guilty of first degree murder as a coconspirator, it learned from the instruction that it had to find intent to kill or reckless indifference. We also note that the prosecutor's argument concerning the special circumstance allegations was consistent with the law, and she never argued that the jury was not required to find intent to kill or reckless indifference if it found defendant was a nonkiller coconspirator, or if it could not decide whether he was an actual killer. Accordingly, there is no reasonable

114

likelihood that the jury was confused or misapplied the instruction in the manner suggested by defendant.

### *31. Instruction on Multiple-murder Special Circumstance*

Defendant claims that the trial court erred by failing to instruct the jury that it could not find the multiple-murder special-circumstance (§ 190.2, subd. (a)(3)) allegation to be true unless it found he was an actual killer or intended to kill. As a result, he asserts this special-circumstance true finding must be vacated. As we explain, we agree the instruction on this special-circumstance allegation was erroneous, but conclude the error does not require reversal.

"When there is evidence from which a jury could base its convictions for multiple counts of murder on the theory that the defendant was guilty as an aider and abettor, and not as the actual perpetrator, the trial court must instruct the jury that to find true a multiple-murder special-circumstance allegation as to that defendant, it must find that the defendant *intended to kill* the murder victims. (§ 190.2, subds. (b)-(c); *People v. Hardy* (1992) 2 Cal.4th 86, 192 (*Hardy*).) A murderer who was not the actual killer and who lacked the intent to kill, but acted 'with reckless indifference to human life and as a major participant,' can be subject to a punishment of either death or life imprisonment without the possibility of parole only when the prosecution alleges, as a special circumstance, that the murder occurred in the commission of certain felonies specified in section 190.2's subdivision (a)(17). (§ 190.2, subd. (d).)" (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 45 (*Nunez and Satele*), italics added.) This rule is inapplicable to the multiple-murder special circumstance. (*Ibid*.) "An erroneous instruction on the intent to kill element of a special circumstance, however, 'does not require reversal if a reviewing court concludes … that the error is harmless beyond a reasonable doubt.' " (*Ibid*.) Applying the harmless error rule of *Chapman v.*

115

*California* (1967) 386 U.S. 18, 24, "a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is 'no,' " the error is harmless and reversal is not required. (*Neder v. United States* (1999) 527 U.S. 1, 19 (*Neder*); *id*. at pp. 8-15; see also *People v. Williams* (1997) 16 Cal.4th 635, 689 ["when a trial court fails to instruct the jury on an element of a special circumstance allegation, the prejudicial effect of the error must be measured under the test set forth in *Chapman v. California*"].)

Here, the trial court instructed the jury on the multiple-murder special circumstance (CALJIC No. 8.81.3) as follows: "To find the special circumstance referred to in these instructions as multiple murder convictions, is true, it must be proved that: [¶] A defendant in this case has been convicted of at least one crime of murder in the first degree, and one or more crimes of murder in the first or second degree."

In addition, the fourth paragraph of CALJIC No. 8.80.1 (*ante,* pp. 109-110), informed the jury that "if you are satisfied beyond a reasonable doubt that the defendant *actually killed* a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true." (Italics added.) Thus, the instruction correctly told the jury if it found defendant actually killed, it did not have to find he intended to kill in order to find a burglary, robbery, or multiple-murder special-circumstance allegation true. (See *People v. Dennis* (1998) 17 Cal.4th 468, 516 ["when the defendant is the actual killer, intent to kill is not an element of either the felony-murder special circumstance or the multiple-murder special circumstance"]; see also *People v. Anderson* (1987) 43 Cal.3d 1104, 1138-1147, 1149-1150.)

If, however, the jury found defendant was not the actual killer or could not decide as between actual killer and aider and abettor or coconspirator the fifth

paragraph of the instruction (*ante*, pp. 109-110) informed the jury that it could not find a burglary, robbery, or multiple-murder special-circumstance allegation true unless "you are satisfied beyond a reasonable doubt that such defendant [*1*] *with the intent to kill* aided, abetted, and counseled, commanded, induced, solicited, requested, or assisted any act during the commission of the murder in the first degree, *or* [*2*] *with reckless indifference to human life and as a major participant* who aided, abetted, counseled, commanded, induced, solicited, requested or assisted in the commission of the crime of burglary or robbery which resulted in the death of a human being, namely, Ramon Morales, Martha Morales or Fernando Martinez." (Italics added.) This was error. (*Nunez and Satele*, *supra*, 57 Cal.4th at p. 45.) In effect, this portion of CALJIC No. 8.80.1 permitted the jury to find the multiple-murder special circumstance true without finding defendant intended to kill a human being. An instructional error in this context is harmless under *Chapman* however, "when, beyond a reasonable doubt, it did not contribute to the verdict." (*People v. Williams* (1997) 16 Cal.4th 635, 689.) As we observed in *Williams*, this standard may be met when we are able to conclude that the jury necessarily found an intent to kill under other properly given instructions, or when evidence of the defendant's intent to kill is overwhelming and the jury " 'could have had no reasonable doubt' that the defendant had the intent to kill." (*Ibid.*) Here, as we explain, the error was harmless because overwhelming evidence established, and the jury could have had no reasonable doubt, that defendant intended to kill, and that he was an actual killer.

Defendant relies heavily on the fact that the jury did not reach a unanimous verdict on the allegation he personally used a .38-caliber handgun within the meaning of former section 12022.5, subdivision (a), to argue the instructional error concerning the multiple-murder special circumstance was prejudicial. On the contrary, the evidence fairly considered here offers no other reasonable scenario

117

than defendant being the individual who shot Martha in the head with the .38-caliber handgun in the bedroom and that he did so with the clear intent to kill, rendering the instructional error harmless.

Defendant admitted in his videotaped statement that he was such shooter. ("[W]e *all* shot. We fired *the weapons that we had … we shot* really like crazy." "[W]e *shouldn't have done anything … to the lady*." (Italics added.)) Defendant's admission is entirely consistent with the physical evidence of the murders (the location of the victims, defendant, and his coparticipants, ballistics, defendant's fingerprint on the box of .38-caliber ammunition used, and the manner of Martha's killing, as described below), and the evidence of the group's planning activities and conversations before the home invasion.

It is undisputed that Sanchez was armed with and shot the victims with the AR-15 rifle, a weapon that ordinarily requires two hands to fire. It is undisputed that Nunez shot the victims with the .30-30 rifle, a weapon that ordinarily requires two hands to fire. It is undisputed that in addition to suffering gunshot wounds from one or both of these rifles, each victim was shot with a .38-caliber handgun. There was evidence of only two possible handguns that could have been that gun. Both were found by defendant in the kitchen. Defendant kept at least one of the guns. The box of .38-caliber ammunition used to shoot the victims was found in the bedroom and defendant's fingerprint was on it.

All three calibers of bullets were found in Martha's body, which was found in the bedroom. The .38-caliber handgun and .30-30 rifle bullets that caused Martha's fatal head wounds were recovered from her shoulder and armpit, respectively. The AR-15 rifle bullet was recovered from her side. The two fatal head wounds caused by the .38-caliber handgun and .30-30 rifle essentially blew off her face. That is, ballistics establishes that the shooter of the .38 handgun was in the bedroom with Martha and Alejandra. The .38 shot to Martha's head reflects

118

a clear intent to kill. (See, *ante* at pp. 62-63, discussing defendant's shooting of baby Alejandra; see e.g., *People v. Mayfield* (1997) 14 Cal.4th 668, 768 ["The shot was fired at Sergeant Wolfley's face, which is consistent with a preexisting intent to kill."].)

The body of Martinez was found between the bedroom and the living room, consistent with Nunez shooting him as he tried to escape. The body of Ramon was found in the living room, where Sanchez had been holding him at gunpoint throughout the home invasion robbery. There is no rational way that the jury could have found that defendant handled the .38-caliber ammunition in the bedroom, but did not load and shoot his handgun (despite his admission to having fired a weapon) and rather, found Sanchez — the only other person who potentially had a handgun (possibly another .38) in his pocket — (1) used both hands to fire his AR-15 rifle at the victims, (2) somehow obtained the .38-caliber ammunition from the box defendant handled in the bedroom in order to load the handgun from his pocket, and (3) switched from using the AR-15 rifle to using the .38-caliber handgun to shoot the victims *again* with the smaller weapon.

There is simply no plausible explanation based on the evidence why Sanchez would have wanted to change weapons and go into the bedroom to shoot Martha with the small handgun after shooting her with the rifle. Such a scenario also would likely have taken longer than the 30 seconds of "fairly rapid" gunfire heard by the witnesses. Instead, the evidence overwhelmingly supports a scenario of Sanchez shooting the victims with the AR-15 rifle, Nunez shooting the victims with the .30-30 rifle, and defendant shooting the victims with the .38-caliber handgun, which he loaded with ammunition he found in the bedroom, all in a flurry of gunfire. The physical evidence does not depend in any way on Ramirez's testimony. The overwhelming evidence thus reflects that defendant intentionally and fatally shot Martha with a .38-caliber handgun. Therefore, the record compels

119

the conclusion that the instructional error regarding the multiple-murder special circumstance was harmless beyond a reasonable doubt. (See also *People v. Maciel* (2013) 57 Cal.4th 482, 521 [multiple-murder special circumstance does not require a finding of intent to kill every murder victim].)

### 32. Robbery and Burglary Special-circumstance Instructions

Defendant presents several claims of instructional error regarding the robbery and burglary special circumstances. He asserts the alleged errors individually and cumulatively violated his rights under state law and the Eighth and Fourteenth Amendments to the federal Constitution. As we explain, each claim is without merit.

### a. Failure to instruct on the definition of "actual killer" and causation

Defendant contends that the term "actual killer" should have been defined with regard to the use of that phrase in CALJIC No. 8.80.1 and that the jurors should have been instructed on the law of causation, "because there were multiple shooters and unresolved factual questions as to which shooters actually caused the victims' death." The claim is without merit.

Even assuming that instruction on the term "actual killer" and on causation should have been given, we do not believe it was reasonably probable that such omissions affected the verdicts. (See *Flood*, *supra*, 18 Cal.4th at p. 490.) The evidence was overwhelming that each victim was shot multiple times and by more than one of the coparticipants. The evidence was undisputed that Martha suffered two fatal gunshot wounds to her forehead, one of which was caused by a .38-caliber bullet. As discussed *ante*, no reasonable juror could have failed to find that defendant intentionally and fatally shot Martha with a .38-caliber handgun. To the extent the jury would not have been able to conclude defendant or any other coparticipant was the actual killer of the other victims, as a practical matter, the

120

jurors would have known that they needed to find intent to kill or reckless indifference in order to find the burglary or robbery-murder special-circumstance allegations true. Under these circumstances, any failure to instruct on causation could only have inured to defendant's benefit. The claim fails on the merits.

### b. Burden of proof

Defendant contends the following portion of CALJIC No. 8.80.1 improperly shifted the burden of proof: "If you find that a defendant was not the actual killer of a human being . . . ." He asserts the phrase "[i]f you find" unconstitutionally implied that he was obligated to prove he was not the actual killer. We disagree.

There is no reasonable likelihood that the jury understood the phrase to shift the burden of proof. The instruction explicitly informed the jury that the prosecution bore the burden of proving the truth of the special circumstance allegations and explained the findings that it was required to make based on the evidence. In considering the truth of the special circumstance allegations, the jury necessarily would have already found defendant guilty of murder beyond a reasonable doubt. In considering the remaining inquiries posed by the instruction, the jury logically would have understood that if it found beyond a reasonable doubt that defendant was the actual killer, then it was not required to find intent to kill or reckless indifference. Otherwise, if the jury could not find beyond a reasonable doubt that defendant was the actual killer, then it was required to make a finding regarding whether the prosecution had proved beyond a reasonable doubt intent to kill or reckless indifference as a major participant. Nothing in the instruction suggested that defendant was required to provide any proof that he was not the actual killer.

121

Defendant next complains that the following portion of CALJIC No. 8.80.1 unconstitutionally defined the burden of proof:  "you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill."  Defendant contends that the phrase "unless you are satisfied" improperly defined the burden of proof and allowed consideration of the jurors' subjective opinions.  We disagree.

The instruction informed the jury that "[t]he People have the burden of proving the truth of a special circumstance.  If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true."  There is no reasonable likelihood that any juror interpreted the word "satisfied" to mean anything other than he or she had to be convinced that the prosecution had carried its burden.

### c.  Consciousness of guilt instructions

Defendant contends the jury was erroneously permitted to consider the consciousness of guilt, CALJIC No. 2.03, and flight, CALJIC No. 2.52, instructions (see fn. 38, *ante*), in determining the special circumstances allegations.  Defendant asserts it was error to permit the jury's consideration of these instructions because, even though consciousness of guilt evidence such as flight and false statements is probative concerning whether a defendant committed a crime, it does not bear on the nature of the crime or a defendant's state of mind at the time of the crime.

The claim is without merit.  The consciousness of guilt instructions expressly informed the jurors that evidence such as flight and false statements may be considered on the *question of guilt*, and that each juror much decide the weight and significance to accord the evidence.   Moreover, the trial court explained to the jury under CALJIC 17.31 that "[w]hether some instructions apply will depend

122

upon what you find to be the facts. Disregard any instruction which applies to facts which you determine do not exist." (See *People v. Saddler* (1979) 24 Cal.3d 671, 684 [although CALJIC No. 17.31 "does not render an otherwise improper instruction proper, it may be considered in assessing the prejudicial effect of an improper instruction"].) We presume the jury followed the trial court's instructions. (*People v. Chism* (2014) 58 Cal.4th 1266, 1299.) Therefore, if, as defendant asserts, the consciousness of guilt evidence was not relevant to the special circumstance allegations, then the jury would have disregarded the instructions. Consequently, there is no reasonable likelihood that the jury applied the consciousness of guilt instructions in a manner that violates the Constitution. (*Estelle*, *supra,* 502 U.S. at p. 72.) Accordingly, the instructions did not violate defendant's federal constitutional right to reliable verdicts.

Finally, because defendant fails to demonstrate that the above instructions were erroneous, we reject his claim that the asserted errors, individually or cumulatively, violated his state and federal constitutional rights.

### 33. Constitutionality of the Felony-murder and Multiple-murder Special Circumstances

Defendant argues the felony-murder and multiple-murder special circumstances are unconstitutional, as follows. First, he asserts the felony-murder special circumstance is unconstitutional because it fails to narrow the class of death-eligible murders, fails to require the prosecution to prove mens rea, fails to require an intentional killing, violates equal protection, and diminishes the relationship between criminal liability and moral culpability. Second, defendant contends the multiple-murder special circumstance too broadly makes defendants death eligible. Finally, defendant contends the felony-murder special circumstance is not a validly enacted statute.

123

Defendant concedes that this court has rejected these claims. (See e.g., *People v. Boyce* (2014) 59 Cal.4th 672, 700 [the felony-murder special circumstance is constitutional]; *People v. Stanley* (2006) 39 Cal.4th 913, 968 [same]; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1265-1266 [same]; *People v. Marshall* (1990) 50 Cal.3d 907, 945-946 [same]; *People v. Anderson*, *supra*, 43 Cal.3d at pp. 1146-1147 [same]; *People v. Solomon*, *supra*, 49 Cal.4th at p. 843 [the multiple-murder special circumstance is constitutional]; *People v. Lucero* (2000) 23 Cal.4th 692, 740 [same]; *Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 991 ["the various modifications and amendments made by Proposition 115 to paragraph (17) of section 190.2, subdivision (a) . . . are . . . effective"]; see also *People v. Hoyos* (2007) 41 Cal.4th 872, 890 ["*Yoshisato* held that Proposition 115's amendments to section 190.2 were operative, and went into effect the day of Proposition 115's passage in June 1990."].) Defendant provides no persuasive reason for revisiting this court's prior decisions.

### 34. Asserted Cumulative Prejudice

Defendant contends the cumulative effect of his asserted guilt phase errors requires reversal of his convictions. As discussed above, we will reverse the penalty judgment due to the trial court's erroneous excusal of a prospective juror for cause under *Witherspoon*/*Witt*. Otherwise, to the extent there are instances in which we have found error or assumed its existence, we have concluded defendant suffered no prejudice. Even when considered cumulatively, the errors did not render defendant's trial fundamentally unfair. For these reasons, the claim of cumulative prejudice fails.

### C. Penalty Phase Issues

Defendant raises several claims of error at the penalty phase. Given the penalty judgment must be reversed for *Witherspoon*/*Witt* error, we need not reach

124

these claims, with the exception of defendant's claim concerning the restitution fine imposed. (See *Riccardi*, *supra*, 54 Cal.4th at p. 839.)

Defendant requests reconsideration of the $10,000 restitution fine the trial court imposed pursuant to Government Code former section 13967.[40] That section, which did not authorize a trial court to consider a defendant's ability to pay in setting the amount of restitution, was subsequently repealed in its entirety in 2003. Section 1202.4 now "provides detailed guidance to the trial court in setting a restitution fine, including consideration of a defendant's ability to pay." (*People v. Vieira* (2005) 35 Cal.4th 264, 305 (*Vieira*).) In pertinent part, section 1202.4, subdivision (c), now provides that "[a] defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine[] . . . [but] may be considered only in increasing the amount of the restitution fine in excess of the [statutory] minimum."

We explained in *Vieira*, 35 Cal.4th at page 305, that " '[i]f the amendatory statute lessening punishment [(here, § 1202.4)] becomes effective prior to the date the judgment of conviction becomes final then, in our opinion, it, and not the old statute in effect when the prohibited act was committed, applies.' " " '[F]or the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed.' " (*Id.* at p. 306.) Therefore, the

---

**40** At the time of defendant's sentencing in 1998, Government Code section 13967 read: "Notwithstanding Section 13340, the proceeds in the Restitution Fund are hereby continuously appropriated to the board for the purpose of indemnifying persons filing claims pursuant to this article. However, the funds appropriated pursuant to this section for administrative costs of the State Board of Control shall be subject to annual review through the state budget process." (Gov. Code, § 13967, added by Stats. 1994, ch. 1106, § 2, p. 6548 and repealed by Stats. 2002, ch. 1141, § 10, p. 7390.)

question of defendant's restitution fine must be remanded for reconsideration under the currently applicable statute.

## III.  DISPOSITION

The judgment of death is reversed and the matter remanded for a new penalty determination and reconsideration of the question of a restitution fine under the currently applicable statute.  If the People choose not to contest the question of restitution on remand, defendant's restitution fine shall be reduced to the statutory minimum.  In all other respects, the judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Covarrubias

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S075136
**Date Filed:** September 8, 2016

_____

**Court:** Superior
**County:** Monterey
**Judge:** Robert Moody

_____

**Counsel:**

Thomas Lundy, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Alice B. Lustre, Glenn R. Pruden and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Thomas Lundy
2777 Yulupa Avenue, PMB 179
Santa Rosa, CA  95405
(707) 538-0175

Bridget Billeter
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-1340